**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paulette WALTERS,
Defendant-Appellant.**

No. 78–5323.

United States Court of Appeals,
Fifth Circuit.

March 26, 1979.

Rehearing and Rehearing En Banc
Denied April 23, 1979.

Alan E. Weinstein, Miami Beach, Fla., (Court-Appointed), for defendant-appellant.

Jack V. Eskenazi, U. S. Atty., Caridad P. Matthews, Linda Collins Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before GEWIN, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

Paulette Walters appeals from her conviction for violations of 21 U.S.C. §§ 952, 963 (1976). Appellant raises two grounds for reversal of her conviction. First, she contends that the trial court should have suppressed the drugs found on her person after she entered our country. She argues that the search must be supported by probable cause, since it was not a border search and, alternatively, that even if the search is viewed as a border search, it was not justified by reasonable suspicion. Second, appellant claims that the trial court should have dismissed the case due to violations of the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1976) [hereinafter "the Act"].

Since we will relate the facts more extensively below, we sketch only the basic facts here. On August 2, 1976 appellant arrived at Miami International Airport from Quito, Ecuador. Although her appearance was somewhat suspicious, customs officer Isley allowed appellant to pass through customs after a luggage search and a few questions. One of the questions was whether she knew a group of four people behind her. She replied that she did not. After appellant had entered the general airport area, Isley found out from the group of four that appellant in fact knew them. At this point, Isley called appellant back to the customs enclosure where she was subjected to a search under her garments. Cocaine was found taped to her body. The trial court refused to suppress the cocaine and appellant was convicted. We affirm.

## I. THE VALIDITY OF THE SEARCH.

### A. The Standard

■ The government characterizes the strip search as a border search[1] justifiable by reasonable suspicion. However, appellant argues that "once [she] was passed through the enclosure without surveillance, her Fourth Amendment protection attached again," appellant's brief at 11, and she "may not be stripped of the probable cause protection mandated by the Fourth Amendment," *id.* at 12. We can discern no such bright line demarcating the border from the rest of the country for Fourth Amendment purposes. The border is a "zone, not a line. . . ." *Almeida-Sanchez v. United States*, 413 U.S. 266, 294, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1972) (White, J., dissenting).[2]

■ In deciding whether a border search standard applies to a particular search, the courts have attempted to strike a balance between shutting out contraband and illegal aliens on the one hand, and impinging on the individual's interest in being free from governmental intrusion on the other. *See, e. g., Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1972); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In striking this balance, we have viewed searches similar to the search here to be border searches requiring a less demanding degree of justification than a domestic search. In *United States v. Maggard*, 451 F.2d 502 (5th Cir. 1971), *cert. denied*, 405 U.S. 1045, 92 S.Ct. 1330, 31 L.Ed.2d 587 (1972) as a car was allowed through a border checkpoint, the customs agents noticed it was sagging in the rear. The car was followed and searched two miles up the road. The Court refused to suppress the drugs found in the car, reasoning that the search was a valid border search. Similarly, in *United States v. Morales*, 378 F.2d 187 (5th Cir. 1967), the defendant was passed on foot through a border checkpoint, but he was arrested and searched a short distance away due to his suspicious actions and his connections with a car that followed him through the border

---

1. This Court has held that the customs enclosure at Miami International Airport is the functional equivalent of a border. *United States v. Martinez*, 577 F.2d 960 (5th Cir. 1978); *United States v. Barger*, 574 F.2d 1283 (5th Cir. 1978); *United States v. Olcott*, 568 F.2d 1173 (5th Cir. 1978).

2. *Almeida-Sanchez* involved the validity of a search without probable cause or consent by a roving border patrol 25 miles from the border. Its holding is not directly applicable here.

and picked him up prior to the arrest. This Court viewed the search as a valid border search. *Accord, United States v. Thomas,* 372 F.2d 252 (5th Cir. 1967). In the context of airports, our courts have held that the government's authority to administer a border search does not end automatically when a traveler steps out of the customs enclosure. *United States v. Martinez,* 577 F.2d 960, 962 (5th Cir. 1978) ("Having been under constant surveillance after crossing the border, however, and still being in the airport area, defendants were clearly subject to a customs search for which no warrant is required"); *United States v. Wardlaw,* 576 F.2d 932 (1st Cir. 1978) (border search conducted after defendant left customs enclosure and was waiting for a cab); *United States v. Palmer,* 575 F.2d 721 (9th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 212, 58 L.Ed.2d 189 (1979) (border search conducted after defendant left customs enclosure and was returned from baggage area).

Instead of drawing formalistic rules based on how long or how far a person has penetrated into the country, we will continue to determine whether a search is at the border based on whether the rationale for border searches is vindicated without impinging the rights of persons "lawfully within the country. . . ." 267 U.S. at 154, 45 S.Ct. 280. *See United States v. Fogelman,* 586 F.2d 337, 350 (Godbold, J., dissenting in part). The degree to which the traveler has been assimilated into the "mainstream of domestic activity," 576 F.2d at 935, is one measure of such impingement. Likewise, surveillance of the defendant after he or she has crossed the border assures us that the contraband has crossed the border and that the government therefore may exercise increased leeway in searching for it. *See United States v. Johnson,* 588 F.2d 147, at 154 (5th Cir. 1979) ("A search is not a valid border search unless it appears by a preponderance of the evidence, direct or circumstantial, that a border crossing has occurred.") (footnotes omitted).[3]

Under the facts of this case, the integrity of our border has been protected with little more interference with domestic activity than would have been caused if appellant had never left the customs enclosure. In addition, the facts raise little doubt that the drugs found on appellant had in fact crossed the border.

At the suppression hearing appellant recounted her activities from the point when she left the customs enclosure:[4] she went upstairs to the end of the airport terminal building; she went into a drugstore where she bought a soda and looked at magazines; and she returned to the airport lobby where she was standing when agent Isley requested her to return to the customs enclosure. A total of fifty-five minutes had elapsed since she had left the enclosure. Thus, appellant was not significantly removed physically or temporally from the border. Moreover, to the extent appellant was removed from the border, the *nature* of her activities was not such that would require an intrusion into domestic activities in order to search her. *Compare Montoya v. United States,* 392 F.2d 731 (5th Cir. 1968) (search cannot be justified as a border search where the defendants have already checked into a hotel upon arrival into the country). Finally, taking into account the appellant's limited activities during the fifty-five minute hiatus, that her bulky clothing was unchanged when she returned to customs, and that the cocaine was taped to her body under heavy clothes and a girdle, we are satisfied that a fact finder could reasonably conclude that the cocaine was in that same place when appellant entered the country. Accordingly, we hold that the search in this case must be measured by the standards applicable to border searches.

### B. Applying the Standard

Having decided that this was a border search, we must determine whether the cir-

---

3. Thus, contrary to appellant's contention, *Johnson* does not require a certainty that a border crossing has occurred.

4. Appellant was not observed by any customs or other law enforcement officer after leaving the enclosure until she was accosted by Isley.

cumstances raised a reasonable suspicion that contraband might be found where the customs agent decided to search. *See, e. g., United States v. Afanador,* 567 F.2d 1325 (5th Cir. 1978); *United States v. Himmelwright,* 551 F.2d 991 (5th Cir. 1977), *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1978). Appellant relies primarily on *Afanador* in support of her contention that the search was not based on reasonable suspicion. In *Afanador,* customs officials received information that a stewardess, Vidal-Garcia, would be carrying cocaine into Miami International Airport from Colombia on a particular flight and date. An examination of the flight crew's luggage revealed nothing suspicious. Customs officials searched under the garments of Afanador, another stewardess on the flight, and found cocaine taped to her body. The officials then similarly searched Vidal-Garcia, the stewardess about whom they received the tip. They found cocaine taped to her body as well.

The government proposed two theories to meet the reasonable suspicion standard and thus to validate the search of Afanador. First, the government argued that Afanador's air line uniform matched a smuggler's profile. However, the Court held that Afanador did not closely resemble the profile and that even a close resemblance would not in itself provide the reasonable suspicion required by *Himmelwright.*[5] Second, the government contended that Afanador's "link" to Vidal-Garcia, a suspicious looking travelling companion, provided the reasonable suspicion necessary to justify its search under her clothing. Other than this connection, there was no particular reason to suspect Afanador of any wrongdoing. Nevertheless, all six members of the crew were routinely strip searched. In holding the government's argument insufficient to establish reasonable suspicion, the Court stated: "Only where reasonable suspicion is specifically directed to the individual to be searched, as the case with appellant Vidal-Garcia, may an intrusive search be conducted." 567 F.2d at 1331.

Under the circumstances of this case, *Afanador* does not require the suppression of the evidence against appellant. First, appellant's mode of dress was suspicious in a number of respects. Unlike Ms. Afanador, whose attire was no bulkier or different than any other Aerocondor stewardess, appellant's clothing was unusually bulky and heavy, considering the climate from which she came. In addition, her dress was longer in the back than it was in the front, possibly due to items hidden under her clothes. Second, appellant was not recalled to the customs enclosure and strip searched until agent Isley's suspicions were "specifically directed" at her. Although agent Isley was somewhat suspicious of appellant because of her appearance, he allowed her to pass. In doing so, he asked her if she knew four individuals who were behind her in going through customs. She replied that she did not. After appellant left the enclosure, Isley approached the four individuals and mentioned that their friend (meaning appellant) had been cleared. They replied affirmatively, thereby indicating that they knew appellant and that appellant had lied about not knowing them. One of the four individuals also appeared bulky and a strip search of her was ordered. Only at this point did Isley begin to look for appellant for the purpose of conducting a more thorough search. Thus, Isley's reason for searching appellant was not based merely on a working relationship or physical companionship as in *Afanador*; in addition to her suspicious appearance, there was appellant's falsehood regarding her relationship to the other travelers, one of whom was similarly attired. These facts cumulatively form a basis for a reasonable suspicion that appellant was hiding contraband under her heavy clothing. *See United States v. Barger,* 574 F.2d 1283 (5th Cir. 1978); *United States v. Olcott,* 568 F.2d 1173 (5th Cir. 1978).

### C. Consent

The government alternatively argues that appellant consented to the search.

---

5. "To permit the profile to establish reasonable suspicion on the facts of this case would sanction indiscriminate strip searches of virtually all airline stewardesses at the whim of DEA agents." 567 F.2d at 1330 n.7.

Viewing the totality of the circumstances, *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), we hold that the government has not met its burden of proving that appellant's consent was freely and voluntarily given. *See United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1975); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Smith,* 543 F.2d 1141 (5th Cir. 1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977).

When agent Isley located appellant in the airport, he identified himself as the officer who had inspected her luggage, and he showed her his identification badge. He "requested" her to return to the customs area, where she was "asked" to undress. Agent Isley testified that if appellant had refused to return, "I probably would have insisted that she come in a firm way." On the way back to the customs enclosure, agent Isley explained to appellant that two ladies were coming to search her. Appellant testified that she did not believe that she could refuse to cooperate.[6] Judging by Isley's candid testimony, appellant appears to have been correct in her assessment of the situation. The requests made to appellant by the customs agents were nothing more than rhetorical questions. Agreeing to return and to be searched under these circumstances can hardly be called consent.

## II. SPEEDY TRIAL

Appellant also complains that her indictment should have been dismissed with prejudice due to the government's violations of the Sixth Amendment guaranty of a speedy trial and the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1976).

Appellant was first arrested on August 2, 1976. She was indicted on June 1, 1977.

Due to the government's failure to secure a timely indictment, the indictment was dismissed without prejudice. Forty-five days later, on September 15, 1977, the grand jury handed down a second indictment based on the same circumstances. Appellant challenges her conviction based on the second indictment. Pursuant to this indictment appellant was apprehended in Chicago, Illinois on January 9, 1978. She was arraigned on February 2, 1978. On February 14, 1978 she moved to dismiss the indictment on the basis of a denial of the right to speedy trial. The motion was denied, and her trial was held on April 19, 1978.

The Sixth Amendment right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of trial. *Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975). In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Court enumerated four of the factors which should be used in a balancing test to determine if this right has been violated in a particular case: (a) length of the delay; (b) reason for the delay; (c) timeliness of assertion of the right by the defendant; and (d) prejudice to the defendant. In assessing such prejudice, the court identified three interests which the speedy trial right was designed to protect: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. *Id.* at 530–32, 92 S.Ct. 2182.

A recent comprehensive application of the *Barker* factors was made by this Court in *United States v. Edwards,* 577 F.2d 883 (5th Cir. 1978) (en banc). In the following discussion, our analysis of appellant's speedy trial claim will be correlated with that of this Court in *Edwards.*

---

**6.** The *Schneckloth* case holds that lack of knowledge of the right to refuse a search does not automatically invalidate the consent. The Court in *Schneckloth* was concerned that if the fact of a defendant's knowledge were dispositive of the voluntariness of a consent, "[a]ny defendant who was the subject of a search authorized solely by his consent could effec-

tively frustrate the introduction into evidence of the fruits of that search by simply failing to testify that he in fact knew he could refuse to consent." 412 U.S. at 230, 93 S.Ct. at 2049. Here, the involuntariness of appellant's compliance with instructions is more apparent from agent Isley's testimony than from the testimony of the appellant herself.

A. *Length of Delay.* The length of the delay is a triggering mechanism to determine if the remaining factors need be evaluated. The proper measure of the delay is the total time between arrest and trial. Appellant was arrested August 2, 1976, and was brought to trial April 19, 1978, a delay of nearly 21 months. In *Edwards*, this length of time was considered sufficient to provide a springboard into the remaining *Barker* factors, and it is sufficient in this case.

■ B. *Reason for the Delay.* There are various reasons for the delays between arrest and trial. The first period began August 2, 1976, and lasted until June 1, 1977, approximately 10 months, when the first indictment was filed. The government admits that it was negligent during this initial period in failing to bring defendant to trial. Appellant does not contend that this delay was due to anything other than neglect. Although this reason is not as damaging as intentional delay, it must be weighed against the government. 407 U.S. at 531, 92 S.Ct. 2182; *United States v. Greene*, 578 F.2d 648, 655 (5th Cir. 1978).

The second period began June 1, 1977, when the first indictment was handed down, and ended on June 30, 1977, when the first indictment was dismissed. This is not an unreasonable length of time in which to hear and rule on appellant's motion to dismiss. The dismissal of the indictment necessitated a third period from June 30, 1977 until September 15, 1977 in order to secure a second indictment.

The fourth period extended from September 15, 1977, until January 9, 1978, when the defendant was arrested in Chicago, Illinois. An arrest warrant was issued five days after the date of the second indictment, but defendant was at liberty and outside the jurisdiction of the Southern District of Florida. She was not apprehended until January 9, 1978, a period of nearly four months. This period of delay should not be charged against the government. *Cf.* 18 U.S.C. § 3161(h)(3)(A) (period of delay resulting from absence or unavailability of defendant is not included in computing time within which information or indictment must be filed). The final period began on January 9, 1978, and ended with the trial on April 19, 1978. The three month interval was a reasonable time to arraign the appellant, hold a hearing on her motion to suppress, rule on her other pre-trial motions, take discovery, and set the case for trial.

Of the total of 21 months delay, 10 months delay was due to government negligence, for which the first indictment was dismissed. In addition, four months delay was due to the unavailability of the appellant, and the remainder of the delay was justifiable.

C. *Timeliness of the Defendant's Assertion of the Right.* Appellant's motions to dismiss both the first and second indictments were timely.

■ D. *Prejudice to the Defendant.* In her brief, the appellant does not contend that any form of prejudice resulted from the delay in her trial. Appellant merely asserts that the second indictment should have been dismissed because this is the second time that the government has failed to prosecute its case expeditiously. This failure, however, is not prejudice per se. *See Edwards v. United States*, 577 F.2d at 889; *United States v. Greene*, 578 F.2d 648 (5th Cir. 1978); *United States v. Traylor*, 578 F.2d 108 (5th Cir. 1978).

In conclusion, applying the *Barker* criteria to all of the circumstances of this case, we hold that the appellant was not denied her constitutional right to a speedy trial.

■ We turn now to appellant's claim that the violation of her statutory right to a speedy trial requires a dismissal with prejudice. Since the "sanctions" portions of the Act have not yet gone into effect, 18 U.S.C. § 3163(c), we look to the speedy trial plan adopted by the district from which this appeal was taken. *United States v. Bullock*, 551 F.2d 1377 (5th Cir. 1977). The government has violated Rule 2(a) of Plan for the United States District Court for the Southern District of Florida: "Arraignments. If a defendant is prosecuted on an

information or an indictment, he shall be arraigned within 10 days calculated from the date of the filing of the information or the return of the indictment, or the date of the defendant's apprehension, whichever is last." Appellant was apprehended on January 9, 1978, but she was not arraigned until February 2, 1978, a period of more than ten days.

The appropriate sanction for a violation of the Southern District Plan is within the sound discretion of the trial court. Southern District Plan Rule 4(c). We cannot say that the court abused its discretion in not dismissing this indictment, even though the government had once before violated the speedy trial provisions in this case. Appellant has not even argued that she was prejudiced by the delay.

Accordingly, appellant's conviction is AFFIRMED.