UNITED STATES of America, Plaintiff,

v.

Raymond Wayne RAMOS, Defendant.

No. 79–40–Cr–JLK.

United States District Court,
S. D. Florida.

July 6, 1979.

Linda Carroll, U. S. Atty., Miami, Fla., for plaintiff.

Neal R. Sonnett, Miami, Fla., for defendant.

## ORDER GRANTING MOTION TO SUPPRESS

JAMES LAWRENCE KING, District Judge.

### I. INTRODUCTION

This matter arose upon the motion of the Defendant, Raymond Ramos, to suppress certain evidence. Specifically, the defendant contends that he was the victim of an illegal search by customs officials at the Miami International Airport, and that therefore the cocaine found on his person during that search must be suppressed. This court referred the motion to the United States Magistrate for the purpose of conducting an evidentiary hearing and preparing a report and recommendation. Based upon the evidence adduced at the above hearing, the Magistrate recommended that the motion be denied. The defendant has filed an objection to this recommendation and has petitioned for review by this court.

Upon careful review, for the reasons discussed below, this court concludes that it should not follow the recommendation of the Magistrate and that the motion to suppress should be granted.

### II. THE FACTS

Raymond Ramos, the defendant, arrived at the Miami International Airport on November 18, 1978, after traveling on a flight that originated in Columbia. Mr. Ramos proceeded through a routine customs inspection and was permitted to enter the country by Inspector Cocchini. The inspector testified that there was nothing suspicious about Mr. Ramos at that time.

At approximately the same time as the inspection of Mr. Ramos, another passenger, Sheri Anderson, also proceeded through a customs inspection. However, unlike Mr. Ramos, Ms. Anderson aroused the suspicions of the customs inspector, and she was referred to a secondary inspection area. A search of her person revealed several packages of cocaine. A subsequent search of her handbag revealed a sheet of paper that appeared to be a flight itinerary and that contained the names of three persons—E. Harwell, S. Anderson, W. Ramos. An examination of the customs' declarations submitted by all passengers on that flight disclosed that one of the passengers, Raymond W. Ramos, and Ms. Anderson both resided in the same city, Tampa.

Upon the discovery of this information, customs inspectors Cocchini and Basile began searching the airport to locate Mr. Ramos. They found him exiting the airport hotel and walking toward the pay telephones in the airport lobby. Approximately thirty minutes had elapsed from the time that Mr. Ramos had passed through his customs inspection. His clothing and briefcase appeared the same as they were when he left the customs enclosure after the prior inspection by Cocchini.

Inspectors Cocchini and Basile approached Mr. Ramos and escorted him to the secondary inspection room of the customs enclosure. He was left there temporarily with a third inspector, Sigmund Korzenowski. None of the inspectors made any inquiry regarding his possible relationship with Ms. Anderson or his possible involvement with cocaine. None of the inspectors noticed anything suspicious about the appearance or actions of Mr. Ramos during this period of time.

Shortly after Mr. Ramos arrived at the secondary inspection room, Inspector Korzenowski conducted a pat-down search for the purpose of determining whether Ramos was in possession of any weapons. Korzenowski testified that this was a routine pat-down search, and that there were no articulable facts or circumstances that made him suspect that Ramos was carrying a weapon. During the course of the pat-down a large bulge was discovered on the lower leg of Ramos. A further search revealed that this bulge was caused by an ace bandage and

tape which secured a package of cocaine to the leg.

Although there was no testimony presented at either the preliminary hearing or the suppression hearing regarding additional cocaine found on Mr. Ramos, the government has proffered that Korzenowski would testify that a further search revealed an additional cocaine package taped to Ramos' abdomen. The significance of this proffer will be discussed later.

## III. THE LAW

Since the search of Mr. Ramos obviously was based on less than probable cause, the only rationale which might support the activities of Inspector Korzenowski is that of the border search exception to the probable cause requirement. In this connection, there are three issues with which this court is concerned: (1) Whether the search of Mr. Ramos occurred at the border or its functional equivalent; (2) Whether the pat-down search of the defendant was justified by a reasonable suspicion that the defendant was carrying either contraband or a weapon; (3) Whether it is reasonably certain that the contraband found during the search actually crossed the border. The court now turns to the resolution of these issues.

### A. The Border, or Beyond?

In *United States v. Walters*, 591 F.2d 1195 (5th Cir. 1979), the Fifth Circuit described the criteria which should be used to determine whether a particular search falls within that category of searches which is conducted at a border or its functional equivalent. In *Walters*, as here, the defendant initially was permitted to pass through the customs enclosure and into the main airport lobby, but subsequently was approached by customs inspectors and returned to the customs enclosure for further inquiry and a strip search. Approximately 55 minutes had elapsed between the time the defendant, Walters, first left the customs enclosure and the time that she was approached by the customs inspectors. The Court began its analysis of this search by

noting that it is well settled that the customs enclosure at the Miami International Airport is the functional equivalent of the border. From there, the court turned to the issue of whether the defendant had remained at the functional equivalent of the border after she left the customs enclosure. The court held that this determination must be based on "the degree to which the traveler has been assimilated into the 'mainstream of domestic activity.'" 591 F.2d at 1198. Under the circumstances presented in *Walters*, the Fifth Circuit concluded that she "was not significantly removed physically or temporally from the border . . . [and] the nature of her activities was not such that would require an intrusion into domestic activities in order to search her." 591 F.2d at 1198.

The decision in *Walters* controls this case. Here, the defendant, Ramos, was approached by customs inspectors in the airport lobby a mere thirty minutes after leaving the customs enclosure. Although Ramos, unlike Walters, had registered as a guest in the airport hotel at the time he was approached, this factor is not controlling. The standard for determining whether a search occurs at the border must be applied in light of the facts known to the customs inspectors at the time of the search. Here, Ramos was in the public area of the airport, near the customs enclosure, a very short time after his initial inspection. He had not changed his clothing since departure from the customs enclosure, and he was carrying the same briefcase that he had carried through his initial customs check. This court therefore concludes that Ramos remained at the functional equivalent of the border and that the customs inspectors had the right to detain him for further questioning. Therefore, we now turn to the issue of whether the ensuing search was justified by reasonable suspicion.

### B. The Search

At the outset, the Court notes that since the activities in this case occurred at the border, "it was constitutionally permissible for the customs officials initially to

stop [Ramos], to examine [his] visa, and to search [his] luggage and personal effects for contraband regardless of whether the officials had any articulable suspicion that actual criminal activity was afoot." *United States v. Himmelwright*, 551 F.2d 991, 993–94 (5th Cir. 1977). However, any decision by customs inspectors to go further than this and conduct a personal search must be based upon articulable facts which arouse a reasonable suspicion that the person to be searched is carrying contraband or a weapon. *United States v. Klein*, 592 F.2d 909 (5th Cir. 1979); *United States v. Himmelwright, supra; United States v. Chiarito*, 507 F.2d 1098 (5th Cir. 1975). The Fifth Circuit has developed a sliding scale approach in the determination of whether reasonable suspicion exists for such a search. Thus, the more intrusive the personal search, the greater is the degree of suspicion required. *See United States v. Klein*, 592 F.2d 909, 912 (5th Cir. 1979).

In this case the customs inspector conducted the least intrusive type of personal search—a pat down. His announced, subjective basis for conducting this search was that such searches were routinely conducted for the purpose of discovering weapons. The inspector admitted that there were no articulable facts or circumstances which would lead him to suspect that Ramos was in possession of a weapon. Thus, in the absence of such articulable facts, this search cannot stand as a "stop and frisk" under the dictates of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In apparent recognition of this legal conclusion, the government does not attempt to justify the search as a frisk for weapons. Rather, the government argues that the court should use an objective evaluation of the known facts which would provide reasonable suspicion to search for contraband. If sufficient facts exist, the government contends that the different subjective basis for the search by the customs inspector will not invalidate the search. Using this standard, the government urges that reasonable suspicion for the search existed by virtue of the fact that Ramos' name was found on a slip of paper in the possession of a cocaine-carrying co-passenger and the fact that Ramos resided in the same city as that co-passenger.

Although reasonable suspicion in the context of this precise factual pattern has never been decided previously, there are a myriad of opinions which discuss the existence of reasonable suspicion in connection with similar situations. For example, in *United States v. Walters, supra,* reasonable suspicion to search for contraband underneath the defendant's garments was provided by the unusually bulky and heavy clothing worn by the defendant, the uneven length of her dress (possibly due to items hidden underneath), and the false response to questions regarding her relationship to certain other travelers. In *United States v. Klein, supra,* reasonable suspicion to support a pat down search was found where the defendant was traveling alone in return, from a short trip to Columbia, he appeared unusually nervous, and he was wearing a shirt that was unusually loose in the midriff area below the armpit. Finally, in *United States v. Afanador*, 567 F.2d 1325 (5th Cir. 1978), the Fifth Circuit held that there was not reasonable suspicion to support the strip search of a stewardess on an incoming flight from Columbia where the search was based solely on a confidential tip that another stewardess on that flight would be carrying cocaine. The court stated:

Lest there be any doubt, we state here that "reasonable suspicion" must be specifically directed to the person to be searched. While in narrowly limited circumstances the degree of suspicion as to an already suspicious individual may be somewhat enhanced by virtue of suspicious activity by a closely linked traveling companion at the border, [cite omitted], the fourth amendment does not permit any automatic or casual transference of "suspicion." Though a Siamese symbosis need not be demonstrated, more than physical companionship and/or a working relationship is required. Here there was no independent basis for suspicion of appellant Afanador. . . . [In addition]

there was no attempt to elicit information . . . by questioning. 567 F.2d at 1381.

Therefore, the court held that the evidence derived from the search must be suppressed.

Applying the above standards to this case, the court concludes that the customs inspectors did not possess reasonable suspicion to conduct even the very limited pat down search that occurred here, where the only known facts were that Ramos resided in the same city as a co-passenger who carried cocaine, and that his name was found in her possession. This is not to say that the customs inspectors should have ignored these factors; on the contrary, some further investigation was warranted. However, this court is of the view that this further investigation should have taken the initial form of questioning to determine the relationship between Ramos and his co-passenger, rather than beginning with a search. Here, not one of the three customs inspectors who contacted Ramos before the search made any attempt to question him. A policy of "search now and ask questions later" cannot be condoned by this court. Therefore, the evidence which resulted from this search must be suppressed. This brings us to the final issue regarding the search.

C. *Reasonable Certainty That the Contraband Crossed The Border*

The question of whether it is reasonably certain that any contraband found by customs inspectors actually crossed the border has usually arisen in connection with the determination of whether the search occurred at the border. In most cases it makes sense to combine these determinations, because if it is not reasonably certain that contraband, if found, crossed the border, then a true border search cannot be made, despite the other factors which may point to the existence of a border search.

In other cases, such as this one, it makes more sense to consider the issue of 'reasonable certainty' separately. This separate consideration is necessary because here, where there is a break in the surveillance, it may be reasonably certain from the pre-search perspective that any contraband found will be determined to have crossed the border, but after the particular contraband is discovered there is still some question as to whether it is reasonably certain that the particular contraband crossed the border. Thus, a second-prong determination of reasonable certainty must be made based upon the post-search facts.

In this case, the defendant contends that the cocaine found taped to his leg and secured by an ace bandage easily could have been obtained and secured in this fashion during the break in surveillance. Thus, the defendant concludes that the government has not established to a reasonable certainty that *this* cocaine crossed the border.

The government, in opposition, asserts that reasonable certainty has been established by the evidence that there was only a thirty minute lapse in the surveillance of Ramos, that Ramos had not changed clothes, that Ramos still carried his briefcase, and that Ramos had just arrived at 11:30 at night on a flight from Columbia and checked into a hotel.

After carefully reviewing these circumstances, the court agrees with the government that it is reasonably certain that the contraband found on Ramos crossed the border. The government is not required to negate every hypothetical possibility as to how the contraband may have been obtained subsequent to the border crossing. In this case, the mere assertion by the defendant that there was the opportunity to obtain the contraband after the border crossing is insufficient to controvert the facts established by the government. Although opportunity is, of course, one factor, and might be the controlling factor if the contraband were found loose in a pocket or purse, the court finds that it is highly unlikely that cocaine obtained after a long international flight, late at night almost contemporaneously with registration in a hotel, would be carried in the manner of the cocaine found in this case.

In view of this disposition of this issue, it is unnecessary for the court to consider the

**1114**

additional evidence of cocaine proffered by the government. The court strongly criticizes, however, the practice of the government of withholding this information until the eleventh hour. Even assuming that this action was not intentional, the government cannot be excused from its failure to develop this evidence at either of the two evidentiary hearings previously held in this case.

For the reasons stated in Part II(B) of this opinion, the court does

ORDER and ADJUDGE that the motion to suppress is granted.

DONE and ORDERED in chambers in Miami, Florida, this 6th day of July, 1979.