[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10643

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

FRANCISCO JUNIOR LOUIS,

Defendant- Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20252-KMW-1

_____

Before WILLIAM PRYOR, Chief Judge, and GRANT and LUCK, Circuit Judges.

GRANT, Circuit Judge:

For a ten-day period in April 2020, MetroPCS stores around Miami were targeted in a string of armed robberies. Francisco Louis was arrested for those crimes, but the wheels of justice turned slowly after that—largely because of the Covid-19 pandemic. Whether for excusable reasons or not, the government missed Speedy Trial Act deadlines for both Louis's indictment and his trial. But once the trial moved forward—after a pandemic-induced delay followed by a few continuances requested by Louis himself—he was convicted of six counts of Hobbs Act robbery and sentenced to 218 months' imprisonment.

On appeal, Louis argues that his indictment and trial violated both statutory and constitutional guarantees of a speedy trial. We need not consider the particularities of Louis's statutory arguments; he waived Speedy Trial Act protections by not moving to dismiss on that basis. As for the Sixth Amendment's speedy trial guarantee, Louis has not carried his burden because he cannot show that he was prejudiced by the delays. He also raises several other challenges, including to the sufficiency of the evidence, the jury instruction on flight, the allowance of certain testimony, and the court's refusal to let him try on shoes in court—"if the shoes do not fit, the jury must acquit." These challenges also fail, and we affirm.

## I.

On April 16, 2020, a masked intruder—later revealed to be Francisco Louis—arrived at a MetroPCS store in Miami.[1]  He was a thin black man, wearing basketball shorts, a black t-shirt, black sneakers, black gloves, and a black beanie.  After revealing a gun tucked into his waistband, Louis ordered the store's clerk to hand over both his phone and all the cash in the register.  He then followed the clerk to the back of the store, where he took several iPhones, a tablet, and other assorted merchandise.  His haul complete, Louis drove away in a black Mercedes sedan with a dent on the rear passenger door.

A few hours later, the same man in the same outfit arrived at a nearby Metro PCS store.  He again displayed the gun in his waistband and took the money from the register.  This time he did not take additional items, but he set out in the Mercedes for another MetroPCS.   But his plans were foiled, at least temporarily—the manager at the third store had heard about the first two robberies and locked the door when he saw Louis peering through the window.  Apparently done for the day, Louis got back in his Mercedes and headed to Bee Pawn, a nearby pawn shop.

After a two-day hiatus, Louis resurfaced wearing the same outfit at yet another Miami MetroPCS.  He was more aggressive with the gun this time—pointing it at the clerks and demanding

---

[1] Because Louis challenges the sufficiency of the evidence, we recite the facts in the light most favorable to the government.  *See United States v. Doak*, 47 F.4th 1340, 1354 (11th Cir. 2022).

money from the register.  He got about $700 and made his escape. Four days later, Louis held up a Fort Lauderdale MetroPCS store, his fourth robbery in the spree.  He wore a mask, shorts, t-shirt, sneakers, gloves, and beanie, just like before.  But this time he added a cross-body satchel.  With a young child watching from the back of the store, he drew his gun from the satchel, pointed it at the clerk, and took the money from the register.

Two days later, Louis hit yet another MetroPCS store.  Once inside, he pulled a gun from his satchel and took cash from both of the store's registers before ordering the clerks to the ground and seizing their phones.  The clerks, self-described "sneaker-head[s]," recognized his shoes as Air Jordans.  That same day came the sixth and final episode of the MetroPCS spree.  At one last store, Louis took money from the register and ordered the clerks to the ground. He wore the same outfit and brandished the same gun.

Less than two weeks later, Miami-Dade police officers found the black, dented Mercedes parked at a nearby apartment complex. Officers watched as Louis got in the car and drove away.  He was wearing a cross-body satchel, a Jordan-branded t-shirt, Jordan shorts, and Jordan slides.  They followed Louis, who led them on a high-speed chase.  He eventually crashed the Mercedes and fled on foot, discarding evidence as he ran.

Despite his best efforts—which included jumping over fences and cutting through residential yards—officers soon caught and arrested the now-shoeless Louis.  They recovered his Jordan slides (youth size 7) and a black beanie he left along the way.  And

they later found the satchel he had carried "hidden in some shrubs" near a house along his escape route. The satchel held even more evidence, including a black 9mm handgun, an extended magazine, cash, and Louis's debit card. Inside the Mercedes, the police found multiple phones, a black t-shirt, and black gloves.

Searches of Louis's bedroom and phone unearthed still more evidence: a receipt for a Glock semi-automatic 9mm gun from Bee Pawn, black Jordan sneakers (youth size 6.5), and an outgoing April 18 text message reading, "I got a iPhone 8 brand new in box, never opened." And in one recorded jail call, Louis directed a friend to tell his mother to throw away all his basketball shorts. In another, he asked a friend to tell his mother that he had "been trying to make money, that's why, sorry."

Louis was charged with Hobbs Act robbery in May 2020. After spending several months in state custody on related state charges, he was transferred to federal prison for his initial appearance on January 7, 2021. His arraignment was initially scheduled for two weeks later. But because the government had moved for, and the district court had granted, four continuances, he was not arraigned until May 18. Louis did not oppose any of the government's motions, each of which was sought because of "limitations imposed by the COVID-19 pandemic." The district court granted the first three continuances in their entirety and the fourth in large part, again citing the pandemic. For that last filing, the court explicitly relied on the latest court-wide administrative order, in which the chief judge stated that it was "generally

6                    Opinion of the Court                23-10643

unreasonable to expect the return and filing of an indictment within the period set forth in 18 U.S.C. § 3161(b)." *See* Admin. Ord. 2021-33, S.D. Fla. (Apr. 6, 2021) at 4.

A grand jury indicted Louis on April 29, 2021, and he was arraigned on May 18. By this point, the court-wide administrative orders had continued all jury trials until July 6, 2021. *See id.* at 2. The district court scheduled Louis's trial to begin on August 2, 2021, citing the "coronavirus pandemic, the present incapacity to convene a jury or summon witnesses and the parties' inability to meaningfully consult with clients and prepare for trial."

The trial did not begin on that date. But this time, it was Louis requesting the delays. He filed three consecutive motions to continue the trial, all of which the court granted, and the trial began on March 1, 2022—ten months after he was indicted and fourteen months after he was transferred to federal custody. Louis was convicted of six counts of Hobbs Act robbery and sentenced to 218 months' imprisonment. This is his appeal.

## II.

We review Speedy Trial Act claims de novo. *United States v. Mathurin*, 690 F.3d 1236, 1239 (11th Cir. 2012). Same goes for a sufficiency-of-the-evidence claim. *United States v. Capers*, 708 F.3d 1286, 1296–97 (11th Cir. 2013). For a Sixth Amendment speedy trial claim, we review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Ingram,* 446 F.3d 1332, 1336 (11th Cir. 2006). And we review a district court's jury instructions and evidentiary rulings for abuse of discretion. *United*

*States v. Williams*, 541 F.3d 1087, 1089 (11th Cir. 2008); *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006). But when a defendant fails "to preserve his challenge to an evidentiary ruling by contemporaneously objecting, our review is for plain error." *United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007).

## III.

Louis raises several issues on appeal. The first two—in which he claims statutory and constitutional speedy trial violations—concern the delays between his transfer to federal custody, his indictment, and his trial. The next two address the sufficiency of the evidence and the district court's flight instruction. And the last two ask whether the district court erred when it allowed lay identification testimony and denied his proposed sneaker demonstration. We find none of his arguments persuasive.

## A.

The Speedy Trial Act establishes statutory time limits for a defendant's criminal case. An indictment must be filed against a defendant within thirty days of his arrest, and the trial must follow within seventy days from the indictment. 18 U.S.C. § 3161(b), (c)(1). But the Act does exclude several "periods of delay" when computing its time limits. *Id.* § 3161(h). One of these is a continuance granted when the court finds that "the ends of justice" served by the delay outweigh the interests of both "the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A). But the court needs to put its reasoning on the record. *Zedner v. United States*, 547 U.S. 489, 506–07 (2006).

Here, both parties agree that the thirty-day time limit for indictment began on January 7, 2021, when Louis was transferred from state to federal custody for his initial appearance. He was indicted 112 days later, on April 29, 2021, and his trial started on March 1, 2022, 306 days after his indictment. Louis argues that these delays violated the Speedy Trial Act, and that the district court failed to put the necessary findings on the record to justify the delays when it granted the government's continuances. The government concedes that the court "did not make explicit interests-of-justice findings" but says "the record is clear that each of the four continuances was granted based on limitations in grand jury time during the Covid-19 pandemic."

We need not address that claim for a more basic reason: Louis waived it. A defendant waives his right to dismissal under the Speedy Trial Act if he fails to "move for dismissal prior to trial." 18 U.S.C. § 3162(a)(2); *see United States v. Ogiekpolor*, 122 F.4th 1296, 1311 (11th Cir. 2024). It is true that Louis himself moved to dismiss under the Act on May 4, 2021, well before trial, but the problem is that his filing was made pro se rather than by his counsel. And that means it was invalid under the local rules of the Southern District of Florida: "Whenever a party has appeared by attorney, the party cannot thereafter appear or act on the party's own behalf in the action or proceeding, or take any step therein, unless an order of substitution shall first have been made by the Court, after notice to the attorney of such party, and to the opposite party." S.D. Fla. Local R. 11.1(d)(4). Simply put, Louis could not act pro se while he was represented by counsel.

To be sure, about a week before Louis filed the invalid pro se motion, he asked the court to terminate his public defender because of an irreconcilable conflict—disagreement over the speedy trial issue.  But the district court did not discharge the public defender from the case and appoint private counsel until nine days *after* Louis filed the invalid pro se motion.  And Louis's new counsel never filed a motion to dismiss for a Speedy Trial violation.  In fact, he sought several continuances to prepare for trial.

The facts here well illustrate the function of the Speedy Trial Act's waiver provision.  Louis's primary contention on appeal is that the district court failed to make explicit findings on the record in support of its orders continuing his arraignment.  But we will not hold the court responsible for failing to meet the requirements of a statutory provision that was never invoked.  If counsel had moved to dismiss, the district court may well have put its findings on the record and explained why it was necessary to continue Louis's arraignment.  *See United States v. Dunn*, 83 F.4th 1305, 1318 (11th Cir. 2023).  Because Louis never filed a valid Speedy Trial motion, he waived his right to dismissal under the Act.

## B.

The right to a speedy trial is protected not only by statute, but by the Constitution too.  The Sixth Amendment provides that in "all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  And, unlike in the statutory context, "a defendant who fails to demand a speedy trial" does not "forever waive[]" that constitutional right.  *Barker v.*

*Wingo*, 407 U.S. 514, 528 (1972). So even having forgone the Speedy Trial Act's protections, Louis could still get relief as a constitutional matter if his trial was "unreasonably delayed." *Ogiekpolor*, 122 F.4th at 1305.

Whether that is true depends on four factors: "(1) length of [the] delay; (2) the reason for the delay; (3) the defendant's assertion of his right, and (4) prejudice to the defendant." *United States v. Vargas*, 97 F.4th 1277, 1286 (11th Cir. 2024) (citing *Barker*, 407 U.S. at 530). And unless the first three factors weigh heavily against the government, the defendant is generally required to show actual prejudice to receive relief. *United States v. Davenport*, 935 F.2d 1223, 1239 (11th Cir. 1991).

The first factor, the length of the delay, is a "triggering mechanism"—unless "there is some delay which is presumptively prejudicial," the next factors should not even be considered. *Barker*, 407 U.S. at 530; *see Ogiekpolor*, 122 F.4th at 1305. "A delay exceeding one year is presumptively prejudicial." *Ogiekpolor*, 122 F.4th at 1305 (quotation omitted). The delay is calculated from "the time of arrest or indictment, whichever comes first."[2] *United*

---

[2] We recognize that this Court has not been entirely consistent on this point. In *United States v. Dunn*, for example, we calculated the delay from the time of the indictment, even though the arrest preceded it by more than seven months. 345 F.3d 1285, 1286–87, 1296 (11th Cir. 2003). But that was the opposite of our approach in several earlier cases where we calculated the delay from the time of the earlier arrest, not the later indictment. *See, e.g.*, *United States v. Walters*, 591 F.2d 1195, 1200–01 (5th Cir. 1979); *United States v. Edwards*, 577 F.2d 883, 887–88 (5th Cir. 1978). Under our prior-panel-precedent rule, those earlier cases control. *See Arias v. Cameron*, 776 F.3d 1262,

23-10643                 Opinion of the Court                    11

*States v. Knight*, 562 F.3d 1314, 1323 (11th Cir. 2009) (quoting *United States v. Walters*, 591 F.2d 1195, 1200 (5th Cir. 1979)).

Even when the length-of-delay trigger is satisfied, that first factor "does not weigh heavily against the government unless the second factor, the reason for the delay, *also* weighs against the government." *Ogiekpolor*, 122 F.4th at 1305 (emphasis added). Deliberate attempts to confound the defense are "weighted heavily against the government." *Barker*, 407 U.S. at 531. More neutral reasons like "negligence or overcrowded courts" are "weighted less heavily"—but they still go into the balance. *Id.* That's because "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* Valid reasons, on the other hand, like "a missing witness," are generally considered to justify at least an "appropriate delay." *Id.*

---

1273 n.8 (11th Cir. 2015); *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (decisions of the former Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit). And the earlier cases are in harmony with the Supreme Court's mandate that "[i]n addition to the period after indictment, the period between arrest and indictment must be considered in evaluating a Speedy Trial Clause claim." *United States v. MacDonald*, 456 U.S. 1, 7 (1982).

We also appreciate that after his initial arrest on May 6, 2020, Louis was placed in state custody on state charges. But he was not transferred to federal custody to face federal charges until January 7, 2021. Because that is when he was first "subjected to a *federal* arrest," we calculate the length of the delay from that date. *See United States v. Brand*, 556 F.2d 1312, 1315 (5th Cir. 1977) (emphasis added).

Because Louis's trial took place fourteen months after he was transferred to federal custody, he meets the length-of-delay threshold, and we proceed to the remaining *Barker* factors. The next factor is the reason for the delay, and we see two: (1) practical difficulties created by the Covid-19 pandemic, and (2) Louis's own requests to continue the trial so that he could better prepare. The government is responsible for neither. To start, the nearly four-month delay between Louis's transfer to federal custody (January 7, 2021) and his indictment (April 29, 2021) can be attributed to the pandemic, which complicated the task of convening a grand jury—to put it mildly. *See, e.g.*, Admin. Ord. 2020-76, S.D. Fla. (Oct. 20, 2020); *Vargas*, 97 F.4th at 1292 (pandemic made empaneling juries "unfeasible and dangerous" (quotation omitted)).

Nor did the pandemic disappear once Louis was indicted. At his May 18, 2021, arraignment, the district court scheduled the trial to begin on August 2, 2021, about two and a half months later, "because of the current coronavirus pandemic, the present incapacity to convene a jury or summon witnesses and the parties' inability to meaningfully consult with clients and prepare for trial." Indeed, the pandemic had halted all jury trials in the Southern District of Florida; they did not resume until July 19, 2021, and even then "only in a limited fashion." *Vargas*, 97 F.4th at 1291; *see* Admin. Ord. 2021-33; Admin. Ord. 2021-65, S.D. Fla. (July 8, 2021).

What's more, Louis himself was directly responsible for the seven-month delay between August 2, 2021—the original trial date—and March 1, 2022—the actual trial date. Starting in July

2021, he sought three consecutive continuances, first citing the need to investigate the case, next the need to review discovery, and last the need to contact witnesses. The responsibility for a delay requested by Louis does not "rest with the government." *Barker*, 407 U.S. at 531. For these reasons, the second factor does not weigh against the government. And that means the first does not weigh *heavily* against it. *See Ogiekpolor*, 122 F.4th at 1306–07.

The third factor—the defendant's assertion of his right (or the lack thereof)—also favors the government, but just barely. A "defendant's failure to timely assert his constitutional right to a speedy trial is weighed heavily against the defendant," while "a prompt assertion of the right" may weigh heavily against the government. *Vargas*, 97 F.4th at 1288. To be sure, at the pre-indictment stage, Louis's counsel acknowledged the difficulties the government faced in obtaining an indictment and did not oppose any of the government's motions to continue. But Louis raised the issue on his own. Even setting aside his invalid pro se filing, that motion followed a detailed in-court statement from Louis that was mostly dedicated to his objection that the lengthy delays in his criminal proceedings had violated his right to a speedy trial. And his attorney eventually chimed in during the hearing, informing the court that Louis objected to "any further continuance." So at least for the purpose of the Sixth Amendment (which unlike the Speedy Trial Act does not require a motion to dismiss), Louis asserted his right.

For a time.  This third factor still cuts against Louis because even though he invoked his speedy trial right pre-indictment, he knowingly and voluntarily waived it post-indictment.  The first of his three motions to continue the trial filed by Louis's new counsel stated that he understood and waived his Sixth Amendment right to a speedy trial.  And the second and third reminded the court that Louis had waived the right.  It was not until the January 25, 2022, hearing on the third motion, a little over a month before trial, that defense counsel told the court that Louis no longer agreed to waive his right to a speedy trial.  All this back-and-forth means the third factor, like the others, does not weigh heavily against the government.

Failing to demonstrate that the first three factors weigh heavily against the government, Louis needs to show actual prejudice to succeed on his claim.  *See id.* at 1289.  He cannot.

Prejudice is "assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532.  The "most serious" of these interests is "to limit the possibility that the defense will be impaired" because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*  Here the reason for almost half the delay was so that Louis could—as he requested—prepare for trial, review discovery, file motions, and contact additional witnesses.  Louis has not pointed to any prejudice from these delays; if anything, they *improved* his defense.  Nor does he cite any

23-10643              Opinion of the Court                    15

actual prejudice from the earlier delays. His Sixth Amendment speedy trial claim therefore fails.

## C.

Louis next challenges the sufficiency of the evidence against him. In reviewing a sufficiency challenge, we resolve "all reasonable inferences in favor of the verdict and consider the evidence in the light most favorable to the government." *United States v. Doak*, 47 F.4th 1340, 1354 (11th Cir. 2022) (quotation omitted). The "evidence is insufficient only if no reasonable trier of fact could find guilt beyond a reasonable doubt." *Id.* (quotation omitted).

Louis's contention that the evidence is not sufficient for a reasonable jury to convict him is, in a word, remarkable. To start, he was seen driving the same black Mercedes as the robber, right down to the rear dent. He was wearing a cross-body satchel—just like the one worn in the last three robberies—when he was spotted and fled, first in his dented Mercedes and then on foot. He ditched the satchel while on the run. When police found it in the bushes along his flight path, it contained a 9mm handgun matching the description of the gun in the robberies, ammunition, and Louis's debit card. Back at the Mercedes, officers found a black t-shirt and black gloves inside; just outside the car was a black beanie. A search of Louis's bedroom revealed black Jordan sneakers like those worn in the robberies and a Bee Pawn receipt for the handgun. The serial number on the receipt matched the serial number on the gun in the satchel.

That's not all.  Two days after the first robbery, Louis sent text messages offering to sell a brand-new iPhone and a Mercedes, and in recorded jail calls after his arrest, he instructed a friend to tell his mother to throw away all his basketball shorts.  He also asked the friend to pass along an apology to his mother, along with word that he was "trying to make money."

Louis did testify at trial, denying participation in the robberies and attempting to explain away the evidence connecting him to the crimes.  He claimed that he bought the Mercedes—already containing black gloves and a satchel—from a "friend of an associate" at the end of April or beginning of May.  And he said that he bought the gun a few days later from a friend named Jean Rodriguez, who also provided him with the Bee Pawn receipt.  But this testimony apparently did not sway the jury.  Indeed, when a defendant takes the stand, "he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." *United States v. Brown,* 53 F.3d 312, 314 (11th Cir. 1995) (quotation omitted).  Just so here.

Our conclusion is short—there was more than enough evidence to support Louis's convictions.

### D.

We next turn to the jury instructions.  Over Louis's objection, the court gave the Eleventh Circuit pattern jury instruction on flight.  "Evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt." *Williams,* 541 F.3d at 1089 (quotation omitted).  If the evidence presented

would allow a reasonable jury to conclude that the defendant "fled the police to avoid the charged crime," a district court does not abuse its discretion in giving the instruction. *Id.*

Louis argues that the jury could not infer guilt from his flight because he had other reasons to run (he was driving a stolen car and had a suspended license). He added that "the flight was not contemporaneous" with any of the robberies. To be sure, the probative value of flight evidence "is diminished if the defendant has committed several unrelated crimes or if there has been a significant time delay between the commission of the crime" and "the time of flight." *Id.* (quotation omitted). But less probative does not mean disallowed. And in any event, Louis was apprehended by police less than two weeks after the last robbery; he discarded the satchel containing the gun and other evidence during the chase; and his car was chock-full of evidence connecting him to the robberies, providing ample reason to run. Because a jury could reasonably conclude that he fled to avoid capture for the robberies, the district court did not abuse its discretion in giving the instruction. *See id.*

### E.

Louis's last two challenges are to evidentiary rulings. The first is that Detective Wever's testimony that Louis appeared to fit the same "weight, height, build and general description" of the robber in the surveillance videos was improper lay identification testimony. Louis's objection to the testimony at trial was that it was solicited by a leading question. Because objections "about the

phrasing of questions" do not preserve an argument that the trial court "admitted improper opinion testimony," we review only for plain error. *United States v. Pon*, 963 F.3d 1207, 1225 (11th Cir. 2020) (quotation omitted).

"A plain error is an error that is obvious and is clear under current law." *United States v. Humphrey*, 164 F.3d 585, 588 (11th Cir. 1999) (quotation omitted). To meet that test, Louis must show (1) an error (2) that is plain and (3) that affects his substantial rights. *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014). If the first three conditions are met, we then consider whether the error seriously affects "the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation omitted).

The government, for its part, argues that Wever's testimony was not identification testimony at all. It was not offered, the government says, to identify Louis as the masked man in the videos but to "rebut Louis's repeated suggestion that the Government could not prove its case, because victims could not remember Louis's height, weight, or age."

We need not delve into that question because Louis cannot show a "clear" or "obvious" error either way. *See Humphrey*, 164 F.3d at 588 (quotation omitted). Opinion testimony must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701(b). And "lay opinion identification testimony may be helpful to the jury where there is some basis for concluding that the witness is more likely to correctly identify the defendant from a photograph or video than

is the jury." *United States v. Ware*, 69 F.4th 830, 849 (11th Cir. 2023) (alterations adopted and quotations omitted). Both "the witness's familiarity with the defendant's appearance" at the time of the surveillance and whether the defendant had "disguised his appearance at the time of the offense" are important factors to consider. *United States v. Pierce*, 136 F.3d 770, 774–75 (11th Cir. 1998).

These factors support the admission of Wever's testimony. *First*, Wever was more familiar with Louis's appearance at the time of the robberies than the jury because he participated in Louis's post-arrest interview "less than two weeks after the last robbery," while the jury did not get its first look at Louis until the trial "almost two years later." *See Ware*, 69 F.4th at 851. *Second*, Wever's familiarity with Louis may have been especially helpful because the robber disguised himself with a mask in each of the surveillance videos. *See Pierce*, 136 F.3d at 775. Because there was "some basis for concluding" that Wever was more likely to correctly identify Louis than the jury, the district court did not plainly err in admitting Wever's testimony. *See id.* (quotation omitted).

Finally, Louis argues that it was error to deny his request to try on the Jordan sneakers recovered from his bedroom in front of the jury. According to Louis, this prevented him "from conclusively proving to the jury that he was not the robber captured on the numerous surveillance videos."

Demonstrative evidence, "like any evidence offered at trial, should be excluded 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *United States v. Gaskell*, 985 F.2d 1056, 1060 (11th Cir. 1993) (quoting Fed. R. Evid. 403). Louis's mantra that "if the shoes do not fit, the jury must acquit" is a non-starter. Any probative value to his demonstration would have been minimal because Louis had other ways to argue that the shoes were too small. In fact, the court told Louis's attorney that he could make his point "vigorously" that the shoes found in his closet were size 6.5 and that Louis wore size 8.

In any event, Louis could not have proved that he was innocent by showing that the shoes were too small. At most, the demonstration could have shown that shoes recovered from his own closet did not fit him—a far cry from "conclusively proving" that he was not the masked robber. And there was real danger that Louis could mislead the jury by pretending that he could not fit his feet into the shoes or otherwise manipulating the demonstration. The district court did not abuse its discretion in denying him that opportunity.

★      ★      ★

None of Louis's challenges warrant reversal. We therefore **AFFIRM**.