[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10604

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

VICTOR VARGAS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:18-cr-60265-KMM-1

_____

Before JORDAN, LAGOA, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Victor Vargas appeals his convictions for conspiracy to distribute and possession with intent to distribute heroin in violation of 21 U.S.C. §§ 846 and 841.  On appeal, Vargas argues that the district court erred in denying his motion to dismiss his indictment because a thirty-five-month delay between indictment and arrest deprived him of his Sixth Amendment right to a speedy trial.

We are unpersuaded.  Under our case law, even without showing actual prejudice from the delay, Vargas can succeed on his claim that the government violated his speedy trial right if he can establish that three considerations -- (1) the length of the delay, (2) the reason for the delay, and (3) the defendant's assertion of his speedy-trial right -- uniformly weigh heavily against the government.  *See Turner v. Estelle*, 515 F.2d 853, 856, 858 (5th Cir. 1975) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972));[1] *see also United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003).  This he cannot do.  For the first ten months after Vargas's indictment, the agent on his case made diligent efforts to arrest him.  The case then went cold for eight months, when the case agent was moved to another position.  Then, COVID-19 hit.  For the next sixteen months, the government's operations were disrupted as the nation tried to

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

combat the pandemic, and nothing happened on Vargas's case until his reentry into the country flagged his name in a crime information database and ultimately led to his arrest. The government's inactivity here was at most negligent; it did not act in bad faith or even intentionally delay the case. And this negligence, much of which occurred during an unprecedented global pandemic, is simply not the kind of "flagrant and inexcusable" conduct that weighs heavily against the government. *See Turner*, 515 F.2d at 858.

Because Vargas cannot show that the three factors uniformly weigh heavily against the government, he must demonstrate that he was actually prejudiced by the delay. But Vargas was not prejudiced, as he freely admits. Notably, the delay did not harm his ability to defend himself because the government's case against him was essentially complete long before indictment -- the underlying criminal activity involved a controlled-buy drug transaction, in which Vargas sold two kilograms of heroin to an undercover agent, while being audio and video recorded, and he immediately confessed. The government had nothing to gain by delaying the case and Vargas had nothing to lose. If anything, Vargas was benefitted by the delay -- he was not detained in a large metropolitan correctional center during the early days of the COVID-19 pandemic, but rather was free to come and go as he pleased, including being able to travel to his home country, the Dominican Republic.

Accordingly, we agree with the district court that Vargas's right to a speedy trial was not impaired by the delay and we affirm.

I.

A.

The relevant background is this.  In a recorded call on June 16, 2018, Drug Enforcement Administration ("DEA") Task Force Officer Gonzalo Gandarillas, acting in an undercover role, arranged to purchase two kilograms of heroin from an unknown individual for $110,000.  An hour or so later, Victor Vargas called Officer Gandarillas to ask for a location for the delivery.  Gandarillas said he'd send the GPS information, and they agreed on a time to meet.

After initially meeting up at a Sunoco Gas Station, Vargas followed Gandarillas to the parking lot of a Winn Dixie Supermarket, where Vargas showed Gandarillas the rear storage compartment of his SUV.  Vargas indicated that two kilograms of heroin were hidden inside a bucket containing drywall materials.  Gandarillas insisted on seeing the heroin before handing over the $110,000.  So Vargas "remove[d] the dry wall compound from the bucket to reveal the two kilograms of heroin."  While doing so, "he was video and audio recorded by devices surrounding the SUV on the ground and overhead in a plane."  Vargas was then arrested.

Photographs were taken of the drywall bucket in the SUV and the two kilogram-sized packages that were confirmed to contain heroin.  Vargas waived his *Miranda* rights and confessed to "agreeing to deliver two kilograms of heroin he received in New York to the [undercover officer (UC)] in South Florida upon the UC paying $110,000.00."

After arrest, Vargas agreed to cooperate with investigators looking into "his sources of supply or partners . . . in the deal" and to place calls to his associates. Vargas also agreed to a search of his phone and identified the contacts saved in his phone. Notably, the people who supplied Vargas with the heroin were not in South Florida -- they were believed to be in Mexico and New York. As a result, Vargas was freed the same day he was arrested and "allowed to return to New York" so that he could "cooperate with the New York Division and also cooperate with" South Florida authorities. He paid his own airfare back to New York.

But Vargas never provided that promised cooperation. Instead, the day after his arrest, his suspected Mexican supplier told another undercover officer about Vargas's arrest -- information the government says could only have been reported by Vargas himself or someone close to him. Then, during the next three months, Vargas met twice with New York law enforcement authorities but he indicated that he "didn't want to cooperate at that point." Nor did Vargas help identify his coconspirators. "He no longer answered the phone call of the undercover officer who reached out to him. And he told the agents in New York . . . that he wasn't going to cooperate with them." Officer Gandarillas left a voicemail for Vargas, essentially saying: "Hey, please call me. The case is not going away."

Three months after his initial arrest, in September 2018, Vargas was indicted in the United States District Court for the Southern District of Florida and an arrest warrant issued that same day.

The indictment charged Vargas with conspiracy to possess with intent to distribute one kilogram or more of heroin and possession with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841, 846. Vargas was still living in New York at the time, and he did not know that an indictment had been filed against him.

As it turned out, government agents did not arrest Vargas until nearly three years later. Nevertheless, their attempts began on October 5, 2018 -- about ten days after the indictment was issued -- when South Florida DEA officials "reached out to a number of groups within [the] New York Division [of the DEA] to assist" with Vargas's arrest. Special Agent Brett Palat was the case agent in the Miami Field Division who was working on Vargas's case. He "sent the arrest warrant to a group in the New York Strike Force," which included Task Force Officer Frank Feliciano and DEA Special Agent Neviene Habeeb.

A few weeks later, on October 26, 2018, Special Agent Palat's supervisor, Steven Romain, followed up with Chris Miller in the DEA's New York Division to confirm that their teams were coordinating the arrest of Vargas. Agent Miller replied that the teams had spoken, they were "trying to coordinate with one of the [New York Police Department] warrant squads to get [Vargas] picked up," and they'd "keep [Miami] posted." In early November, Romain wrote Miller again, this time to report that one of the Miami agents had left and that Miller's team should "coordinate the arrest

with [Special Agent] Mike Ahern in the future." Miller said his agents would "reach out" to Ahern.

On January 9, 2019, Supervisory Agent Romain sent a message, all in capital letters, asking the original case agent, Special Agent Palat, to contact New York to "find out what[']s happening with this arrest. Or contact [the U.S. Attorney's Office] and dismiss indictment. I was previously informed that this would be a quick arrest. Thanks Bro." Palat responded, "10-4," and re-emailed the warrant to Special Agent Habeeb in New York. Romain also asked Palat to "check to see if [the] fugitive reports are done." Palat said he would "recheck." At the end of January, Special Agent Palat completed a Department of Justice form, a Form 202 Declaration, to have Vargas's name inputted into the National Crime Information Center ("NCIC"), which is a database that tracks warrants nationwide.

In March 2019, Special Agent Palat followed up with another DEA agent in New York, Kevin Butt. After mentioning that Romain had spoken to an agent in New York named "Pete" about Vargas, Palat forwarded to Butt "the arrest warrant[,] a photo from [Vargas's] arrest, [and] his [driver's license] and CLEAR report," which summarized Vargas's public records information and gave his last known address. Palat thanked Butt and said to contact him if Butt needed anything else. Butt responded the next day, "10-4."

In May 2019, "because [of the] negative results," Supervisory Agent Romain contacted still another New York DEA agent, Rodney Arrington, and instructed Palat to send Arrington a "[c]opy of

warrant, photos, address etc" for Vargas.  Palat sent the materials and informed Arrington that "[w]e believe he still lives at the same place based on the CLEAR report I attached."  Palat said they'd worked on Vargas's case with another law enforcement group in New York and the U.S. Marshals Service Fugitive Squad.  Arrington assured Palat that he'd "get on this next week."

Then, in June 2019, Palat followed up, this time emailing Arrington, to "check and see if you had any luck locating" Vargas.  According to Palat, Arrington responded that "they had gone out once and they didn't see" Vargas at his home.  Arrington added that he "didn't go out this week," but he planned to "get there next week again."

In July 2019, Special Agent Palat sent Vargas's information to the El Paso Intelligence Center (EPIC), which placed a lookout for Vargas in case he left the country.  In September, Palat was transferred to a DEA office in Mexico, and he was no longer on Vargas's case.

With Palat in Mexico, the government's efforts to arrest Vargas stalled.  On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic.  *See United States v. Dunn*, 83 F.4th 1305, 1307 (11th Cir. 2023).  Not surprisingly, the COVID-19 pandemic affected the DEA's operations, as Special Agent Palat later explained in a hearing on Vargas's motion to dismiss the indictment on speedy-trial grounds.  Palat testified that as of March 2020, the DEA was ordered to begin "maximum telework and taking COVID precautions such as physical

distancing . . . to limit the spread of COVID-19." Those orders "slow[ed] some things down." He offered several examples: (1) when agents were on maximum telework, they had to rely on home computers, which made it harder to access the DEA's internal systems; (2) plainly, it was more difficult for the agents to make arrests, because a teleworking agent was unable to arrest anyone while working from his home computer, and the agents had to change how they coordinated meeting with each other while at the same time following a "social-distancing" policy that was in place; and, (3) "obviously, there w[ere] facilities management considerations" so DEA agents had to take into account many different COVID concerns when executing an arrest warrant, including whether to process an arrest in their offices or to lodge a detainee at a detention center.

No activity occurred in Vargas's case during the first sixteen months of the COVID-19 pandemic. Then, on July 18, 2021, Vargas was detained by immigration officials in New York, when he re-entered the United States from the Dominican Republic. The authorities detained him because they had been alerted by the EPIC lookout that Palat had entered in the system some two years earlier. He was released that day, but the U.S. Marshals Service re-arrested Vargas one month later on August 18, 2021, at his home address in Yonkers, New York. He was arraigned by video conference in the United States District Court for the Southern District of Florida on September 22, 2021.

B.

In October 2021, Vargas moved to dismiss the indictment, claiming a violation of his right to a speedy trial, arguing that there was a constitutionally impermissible delay between indictment and arrest. After conducting an evidentiary hearing, a magistrate judge entered a Report and Recommendation ("R&R"), recommending that Vargas's motion to dismiss be denied. Thereafter, the district court adopted the R&R, denied the motion to dismiss, and over-ruled Vargas's objections.

In deciding whether Vargas's speedy-trial rights had been violated, the district court applied the test that we have long utilized for examining this kind of claim. The analysis starts by asking if the length of the delay has been long enough -- typically about a year -- to trigger a full-fledged constitutional analysis. *See Turner*, 515 F.2d at 855–56 (citing *Barker*, 407 U.S. at 530); *see also Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992); *United States v. Oliva*, 909 F.3d 1292, 1298 (11th Cir. 2018). If it is, the court then must decide whether a consideration of the first three "*Barker* factors" -- (1) the length of the delay, (2) the reason for the delay and (3) the defendant's assertion of his speedy-trial right -- weighs *heavily* against the government. *Turner*, 515 F.2d at 856–58. If these factors uniformly do so, prejudice is presumed and the defendant will prevail on his claim; if not, the defendant must establish actual prejudice from the delay in order to prevail. *Id*. at 858–59; *see also Dunn*, 345 F.3d at 1296.

The district court began its discussion by observing that all parties agreed that a thirty-five-month post-indictment delay was

long enough to move forward with the analysis.  Turning to the next question -- whether the first three *Barker* factors uniformly weighed heavily against the government -- the court ultimately found that they did not.  The district court made several factual determinations, all the while stressing that "no hard and fast rule" applies, "each case must be decided on its own facts," and district courts are afforded "considerable deference" when weighing the *Barker* factors, citing *United States v. Clark*, 83 F.3d 1350, 1352, 1354 (11th Cir. 1996).

Much of the trial court's order centered on the most fact-intensive factor -- the reason for the delay.  Overall, the court found that the government had not acted in bad faith or deliberately, but rather had been "merely negligent" in its efforts to apprehend Vargas.  The district court found that the case agent in Miami, Special Agent Palat, had acted diligently, despite the negligence of the New York law enforcement officers whom Palat had asked for assistance.  The court added that, at a minimum, COVID-19 was a "complicating factor" that "mitigate[d] the role of the Government's negligence in the delay."  The district court summed up its determination this way: there was "no doubt that the Government was negligent in its efforts to arrest [Vargas], for the reasons stated . . . , [but] this negligence does not rise to the level that would excuse [Vargas] from the requirement to show prejudice under the fourth *Barker* factor."

As for the third factor -- whether Vargas had timely asserted his right to a speedy trial -- the court found that he had done so, but

that Vargas's "timely assertion of his right to speedy trial d[id] not excuse the requirement to show prejudice under the fourth *Barker* factor." Taking all of the facts and circumstances together, the district court concluded that the relevant factors did not weigh heavily against the government. This meant that Vargas could not succeed on his claim unless he could show actual prejudice by delay. And since Vargas conceded he could not satisfy the actual prejudice prong of the *Barker* test, the court denied the motion to dismiss.

Thereafter, Vargas waived his right to a jury trial and was tried by the court. The defendant and the government jointly filed a factual proffer, which stated that Vargas had committed the offenses alleged in the indictment. On this undisputed record, the district court found Vargas guilty on both counts. He was sentenced to forty-six months' imprisonment, followed by two years of supervised release and a special assessment of $200.

This timely appeal followed.

## II.

Whether Vargas's right to a speedy trial was violated is a mixed question of law and fact. *United States v. Villarreal*, 613 F.3d 1344, 1349 (11th Cir. 2010). We review a district court's legal conclusions *de novo* and its factual findings for clear error. *Id*. We will hold a factual finding clearly erroneous only if we are left with the definite and firm conviction that a mistake has been committed. *Id*.

The basis for Vargas's claim is found in the Sixth Amendment to the U.S. Constitution, which provides that in all criminal prosecutions, the accused shall enjoy the right to a speedy trial.

U.S. Const. amend. VI.  In fact, the right dates even further back than that, as early as the Magna Carta of 1215.  *See Klopfer v. North Carolina*, 386 U.S. 213, 225 (1967) ("[W]hen George Mason drafted the first of the colonial bills of rights, he set forth a principle of Magna Carta . . . : '[I]n all capital or criminal prosecutions,' the Virginia Declaration of Rights of 1776 provided, 'a man hath a right . . . to a speedy trial.'" (footnote omitted) (quoting Va. Declaration of Rights § 8 (1776)).

The Supreme Court has explained that the right to a speedy trial is "an important safeguard" that protects the interests of both the defendant and society.  *United States v. Ewell*, 383 U.S. 116, 120 (1966).  From a defendant's perspective, the right to a speedy trial is designed "to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation[,] and to limit the possibilities that long delay will impair the ability of an accused to defend himself."  *Id.*; *see also Barker*, 407 U.S. at 532.  Moreover, while awaiting trial, a defendant may also be "subjected to public scorn, deprived of employment, and chilled in the exercise of his right to speak for, associate with, and participate in unpopular political causes."  *Barker*, 407 U.S. at 532 n.33 (citing *Klopfer*, 386 U.S. at 221–22).

Society, too, has a strong interest in securing a speedy trial. A delayed trial causes backlog in the system; it increases the opportunity for the suspect to commit other crimes or try to escape while awaiting trial; and it impairs the goal of effective rehabilitation.  *Id.* at 519–20.  Notably, the speedy-trial right is unique among the

defendant's constitutional rights because it does not always serve the defendant's interests to assert the right; sometimes the defendant will be helped by a delay. *Id*. at 520–21.

In light of the multiple purposes underpinning the right to a speedy trial, the Supreme Court has explained that this right defies precise categorization and must be determined by considering all of the circumstances. As we've noted, these circumstances typically center around four factors: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Id*. at 530. But despite articulating these factors -- now commonly known as the "*Barker* factors" -- the Supreme Court has cautioned that the right to a speedy trial is "a more vague concept than other procedural rights," and that it is "impossible to determine with precision when the right has been denied." *Id*. at 521. As a result, "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Id*. at 522 (citing *Beavers v. Haubert*, 198 U.S. 77, 87 (1905)); *see also Beavers*, 198 U.S. at 87 (speedy-trial right is "necessarily relative"). The inquiry will be an "ad hoc" one, balancing all relevant factors. *Barker*, 407 U.S. at 530.

The *Barker* factors were therefore originally intended to be only "some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right." *Id*. The Court has instructed that "none of the four factors . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors

and must be considered together with such other circumstances as may be relevant." *Id*. at 533. "[T]hese factors have no talismanic qualities" and "courts must still engage in a difficult and sensitive balancing process," still recognizing that the right to a speedy trial is a fundamental one. *Id*.

To this end, the Supreme Court has said that each of the *Barker* factors should be viewed on a sliding scale, with few hard and fast rules. "The first [factor] is actually a double enquiry." *Doggett*, 505 U.S. at 651. At the outset, the accused must demonstrate a delay "approach[ing] one year" to "trigger a speedy trial analysis." *Id*. at 651, 652 n.1; *see Oliva*, 909 F.3d at 1298. Then, "the court must consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652. The Supreme Court has not dictated how much longer than one year the delay must last in order to weigh against the government. *See Barker*, 407 U.S. at 521 ("We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate."). "[B]ecause of the imprecision of the right to speedy trial," the significance of the length of delay is "necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530–31. In particular, "[t]he length of the delay . . . incrementally increase[es] in weight as the delay becomes increasingly protracted." *Villarreal*, 613 F.3d at 1350 (citing *Doggett*, 505 U.S. at 652, 655–57).

As for the "[c]losely related" question found in the second prong -- that is, "the reason the government assigns to justify the delay" -- the courts again have spoken in general terms. *Barker*, 407 U.S. at 531. "Here, too, different weights should be assigned to different reasons." *Id*. The Court offered these thoughts:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Id*. (footnote omitted).

In calculating this factor, we've held the government responsible for bearing the burden of establishing this factor, and, like the Supreme Court, we allocate different weights to different reasons for delay. *Villarreal*, 613 F.3d at 1351. We've emphasized that the Sixth Amendment requires only a diligent, good-faith effort on behalf of the government to locate and bring a defendant to trial. *United States v. Machado*, 886 F.3d 1070, 1080 (11th Cir. 2018); *see also Smith v. Hooey*, 393 U.S. 374, 383 (1969). When the government fails to pursue a defendant diligently, its negligence will weigh less heavily when it acted in good faith. *Villarreal*, 613 F.3d at 1351. The

22-10604                 Opinion of the Court                      17

government's negligence also weighs less heavily when "the defendant was at liberty and outside the jurisdiction where the indictment was returned." *United States v. Bagga*, 782 F.2d 1541, 1544 (11th Cir. 1986).

As for the third factor, the Supreme Court has noted that "[w]hether and how a defendant asserts his right is closely related to the other factors we have mentioned." *Barker*, 407 U.S. at 531. So, we've found that a defendant's failure to timely assert his constitutional right to a speedy trial is weighed heavily against the defendant. *United States v. Twitty*, 107 F.3d 1482, 1490 (11th Cir. 1997). By the same token, a prompt assertion of the right weighs, sometimes heavily, against the government. *See United States v. Ingram*, 446 F.3d 1332, 1338, 1340 (11th Cir. 2006).

As for the last factor, we've held that actual prejudice is not always a necessary showing for the defendant to establish the denial of his right to a speedy trial. *Hoskins v. Wainwright*, 485 F.2d 1186, 1188 n.3 (5th Cir. 1973). The former Fifth Circuit, in binding precedent, justified overlooking prejudice in these circumstances:

> At some juncture in a criminal prosecution the government's lengthy, inexplicable delay, in the face of vigorous demands for an immediate trial, is so offensive to the Sixth Amendment's guarantee of a speedy trial that a Court must intervene regardless of whether the defendant has been incarcerated, subjected to public scorn and obloquy, or impaired in his ability to defend himself.

*Id.* The Court explained: "The reason for dispensing with the prejudice requirement entirely when the other three factors point heavily toward a violation of speedy trial is deterrence: the prosecution should not be permitted to engage in inexcusable misconduct on the hope that the defendant will not be able to make out a case of prejudice." *Turner*, 515 F.2d at 858 (footnote omitted); *accord United States v. Avalos*, 541 F.2d 1100, 1116 n.32 (5th Cir. 1976). Specifically:

> Where such misconduct has occurred, the state cannot complain that the legitimate interests of its criminal justice system, being pursued in good faith, are being sacrificed because of an honest mistake in a case in which no ultimate harm has been done. Mindful of the difficulties sometimes encountered in weighing prejudice, this Court has concluded that it will not undertake such an inquiry where the prosecutorial error to be forgiven by a finding of no prejudice is flagrant and inexcusable.

*Turner*, 515 F.2d at 858.

So, in discounting the prejudice requirement, we've approached speedy-trial claims this way: No prejudice need be shown where the first three *Barker* factors "weigh *heavily* against the Government." *Ringstaff v. Howard*, 885 F.2d 1542, 1545 (11th Cir. 1989) (en banc); *see also Doggett*, 505 U.S. at 651. This is a high bar -- indeed, the term "heavily" is defined as "ponderously, massively; burdensomely, oppressively," *Heavily*, Oxford English

Dictionary (rev. ed. Dec. 2023), https://www.oed.com/diction-ary/heavily_adv (last visited Feb. 2, 2024) -- and we intended just that. As we've stressed, "courts should not lightly dispense with the actual prejudice requirement because to do so necessarily results in the 'severe remedy of dismissal of the indictment.'" *Ringstaff*, 885 F.2d at 1544–45 (quoting *Barker*, 407 U.S. at 522); *see also Barker*, 407 U.S. at 522 (lamenting that dismissal "means that a defendant who may be guilty of a serious crime will go free, without having ever been tried").

To drive home this point, we have consistently required that for a defendant to avoid making a showing of actual prejudice, *all three factors* must weigh heavily against the government. *See Dunn*, 345 F.3d at 1296 (excusing the defendant from showing actual prejudice only if the first three *Barker* factors "*uniformly weigh heavily against the government*" (emphasis added)); *United States v. Mitchell*, 769 F.2d 1544, 1547 (11th Cir. 1985) (requiring the defendant to show actual prejudice "because only two of the first three *Barker* factors weighed heavily against the government"); *Prince v. State of Ala.*, 507 F.2d 693, 707 (5th Cir. 1975) (excusing the defendant from showing actual prejudice only if "consideration of the other three factors -- length of delay, defendant's assertion of his right, and reasons for the delay -- coalesce in the defendant's favor" (citing *Hoskins*, 485 F.2d at 1192)).

In short, "the three *Barker* factors must indeed weigh *heavily* against the Government before prejudice should be presumed." *Ringstaff*, 885 F.2d at 1545. If they do not -- when, for example, "the

delay was not the result of bad faith or a deliberate attempt to 'hamper the defense,' and was a reasonable and efficient use of judicial resources" -- "a defendant is required to show he suffered actual prejudice in order to prevail." *Id.*

### III.

Our task is to apply this broad body of law to Vargas's claim that he was deprived of a speedy trial because the government waited nearly three years to arrest him after he was indicted in September 2018. We begin, as the district court did, by asking whether the post-indictment delay lasted longer than a year, which is the amount of time necessary to "trigger a speedy trial analysis." *Oliva*, 909 F.3d at 1298. Here, the delay lasted about thirty-five months, which more is than enough time to trigger the *Barker* weighing test.

### A.

Our next assignment, then, is to determine whether a consideration of the first three *Barker* factors -- (1) the length of the delay, (2) the reason for the delay, and (3) the defendant's assertion of his speedy-trial right -- weighs *heavily* against the government. The factors are related and often must be considered together. *See Oliva*, 909 F.3d at 1301 (explaining that where "the first two factors, length of the delay and the reason for it, . . . overlap to an extent," we will "address them together"); *see also United States v. Stapleton*, 39 F.4th 1320, 1327 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 2693 (2023) ("[T]he length of delay doesn't weigh *heavily* against the Government unless the *reason* for the delay also weighs against the Government."); *Clark*, 83 F.3d at 1353.

This approach -- considering together the length of the delay with the reason for it -- is helpful here as well.  For one thing, our precedent provides us with little guidance about the significance of a thirty-five-month delay on its own.  On one extreme, we've not weighed delays heavily against the government in several cases where well over three years elapsed between the indictments and arrests.  *See, e.g.*, *Stapleton*, 39 F.4th at 1327–28 (almost four years); *Machado*, 886 F.3d at 1077, 1081 (over five years); *Bagga*, 782 F.2d at 1543–44 (over three years); *Villarreal*, 613 F.3d at 1355 (ten years); *see also United States v. Register*, 182 F.3d 820, 827 (11th Cir. 1999) (requiring the defendant show prejudice where there was a delay between arrest and trial of thirty-eight months, despite this being "an extraordinary period of time to force a defendant to wait for a trial").  On the other hand, in *Ingram*, a panel of this Court held that the government's two-year post-indictment delay, which was preceded by a two-and-a-half-year pre-indictment delay, excused a defendant from showing actual prejudice.  446 F.3d at 1339–40; *see also United States v. Dennard*, 722 F.2d 1510, 1513 (11th Cir. 1984) (affirming the district court's dismissal of an indictment as to one codefendant, without a showing of actual prejudice, where the post-indictment delay was fifteen months).

In this case, it is particularly necessary to examine the length of the delay alongside the reasons behind it because there were different forces at work for different parts of the delay.  *See, e.g.*, *Ringstaff*, 885 F.2d at 1543–45 (analyzing a twenty-three-month delay of trial claim in several parts -- where seven months were attributable to the defendant's request for a psychiatric evaluation,

and nine of the remaining sixteen months involved a decision by the state to wait for a critical issue of law to be settled); *Avalos*, 541 F.2d at 1116 (analyzing the delay in parts); *United States v. Walters*, 591 F.2d 1195, 1201 (5th Cir. 1979) (same).

The delay between Vargas's indictment in September 2018 and his arrest in August 2021 can be broken conceptually into three parts:  (1) the ten-month post-indictment period when Special Agent Palat, the case agent in Miami, communicated with agents in New York to make the arrest, and when the agent also entered basic information about Vargas into two crime information databases; (2) the next period, which saw no activity for some eight months, when Palat was transferred to a new post in Mexico; and (3) the final period, some sixteen months during the COVID-19 pandemic when nothing happened until Vargas's name was flagged by one of the databases Palat had put his name into (EPIC), upon Vargas's reentry into the United States after a trip to the Dominican Republic.  This time frame also includes the arrest of Vargas one month later.

As for the first part of the delay, the district court found that Special Agent Palat had been diligent during the ten months following indictment, up until Palat was transferred off the case, and we cannot say that this finding is clearly erroneous.  The timeline, as we've laid it out, reflects that during this period, Special Agent Palat and his supervisor checked in regularly (every handful of weeks) with law enforcement agents in New York about arresting Vargas, providing them with his warrant and identifiers, including

his last known address; they contacted at least six different agents in all, some of them multiple times, and involved at least four different law enforcement groups in the New York area. The New York agents repeatedly said they were on the case, they never said they would not take action, and they reported that they had visited Vargas's house at least once and had not seen him but intended to return. Consequently, Palat had no reason to believe they were ignoring his requests. And while Supervisory Agent Romain strongly encouraged Palat to urge the New York agents to make the arrest, the supervisor did not take a different tack with those agents, always remaining cordial. He had no more success with New York law enforcement than Palat did.

Moreover, during this time period, Palat entered Vargas's information into national and international crime information databases to track him down, and one of these was the very database that led to Vargas's arrest at the airport upon his return to United States in July 2021. It's also worth observing that the government did not accidently or negligently let Vargas return to New York in the first place, making it harder for Palat to arrest him. Rather, Vargas initially had agreed to cooperate with law enforcement from his home in New York to help them with their investigation. In the end, Vargas's cooperation was not fruitful, but he still continued living freely in New York.

The district court's finding of diligence is consistent with our case law. In several earlier cases, we've upheld the district court's findings of diligence where law enforcement officers made similar

efforts -- like making a visit or two to the defendant's known address and entering his information into the available crime information databases -- even though the delay was much longer than the delay here. *See, e.g.*, *Machado*, 886 F.3d at 1077–78, 1080–81 (upholding a finding of diligence despite a five-year-plus delay between indictment and arrest where agents visited the defendant's home and church, apparently once each, and upon learning he possibly had fled to Brazil, placed his arrest warrant for interception within the NCIC system and made periodic searches for indicia of his continued presence in the U.S.); *Bagga*, 782 F.2d at 1543–44 (upholding a finding of diligence despite a six-year-plus delay between indictment and arrest where agents had visited the defendant's house and his family's restaurant, apparently once each, sought information from the local police authorities, registered his name with the NCIC system, and made no efforts to locate him in India even though they knew he'd fled there). In these cases, the law enforcement officer's efforts, like those of Special Agent Palat, had been "carried out in good faith and with due diligence, and were all that was required of" him. *See Machado*, 886 F.3d at 1081; *Bagga*, 782 F.2d at 1543–44; *see also Stapleton*, 39 F.4th at 1326, 1327–28.

There is another portion of the timeline that we cannot squarely blame the government for either -- the period beginning in March 2020, when the COVID-19 pandemic hit, and lasting for some sixteen months until Vargas eventually was detained by immigration authorities in New York. The district court found that during this period, COVID-19 was a "complicating factor" that

"reduce[d] the extent to which the Government was responsible for the delay." We can discern no clear error in this finding either.

As we see it, an emergency global health epidemic is exactly the kind of "complicating factor" that would reduce the government's responsibility for a delay in making an arrest. At the most basic level, everything slowed down during the COVID-19 pandemic. After the World Health Organization declared the COVID-19 outbreak a global pandemic on March 11, 2020, then-President of the United States Donald Trump declared a national emergency on March 13. *See Dunn*, 83 F.4th at 1307 (citing Proclamation No. 9994, 85 Fed. Reg. 15337, 15337 (Mar. 13, 2020)). At that point, many government institutions began to close for what turned out to be an extended period of time, affecting all aspects of the criminal justice system.

Criminal trials were particularly impaired. Starting in March 2020, the Chief Judge of the United States District Court for the Southern District of Florida issued what would amount to eleven administrative orders that automatically continued all jury trials between March 16, 2020, and July 19, 2021. *See* Administrative Order 2020-18, S.D. Fla. (March 13, 2020); Administrative Order 2021-65, S.D. Fla. (July 8, 2021). Then, when jury trials returned in July 2021, it was only in a limited fashion. Administrative Order 2021-65, S.D. Fla. (July 8, 2021). The orders also sought to stop the clock on all Speedy Trial Act calculations during this period. *Id.*; *see Dunn*, 83 F.4th at 1316–18 (holding that the pandemic-related continuances in a defendant's 2020 trial were within the ends-of-justice

exception to the Speedy Trial Act and noting that many other Circuits had already held that COVID-19 justified "district-wide blanket order[s] temporarily continuing jury trials during this pandemic and excluding that time under the Speedy Trial Act's ends-of-justice exception."). A district court explained, "as a practical matter, the Covid-19 pandemic made the process of empaneling juries (whether grand or petit) unfeasible and dangerous." *United States v. Dunn*, 2021 WL 4516138, at *5 n.3 (S.D. Fla. Oct. 1, 2021), *aff'd*, 83 F.4th 1305 (11th Cir. 2023); *see also United States v. Crittenden*, 2020 WL 5223303, at *3 (M.D. Ga. Sept. 1, 2020) ("The COVID-19 global pandemic places persons' health at substantial risk when they gather in groups in relatively close proximity to one another, particularly indoors where persons are talking[, like during a] jury trial.").

But even before the government could make it to trial, the COVID-19 pandemic affected the DEA's efforts to make arrests, much less extra-jurisdictional ones. As Special Agent Palat testified, the DEA was ordered in March 2020 to begin "maximum telework and taking COVID precautions." Under those orders, arrests plainly were more difficult to effect because the agents generally were working from home, which made it more cumbersome to access internal DEA systems; "social-distancing" measures forced them to change protocol for how they would coordinate with each other; and "facilities management considerations" hindered their ability to "bring a prisoner to the office to process them or . . . to the detention center." In fact, recent research has confirmed that, nationwide, "there was an average 38% decrease in jail bookings

between 2019 and 2020, which equates to over 140,000 fewer jail bookings in a one-year time frame," and "[b]ookings continued to decline in 2021, down 42% compared to 2019 and down 7% compared to 2020 equating to an additional 19,000 fewer jail admissions."  The JFA Institute, The Impact of COVID-19 on Crime, Arrests, and Jail Populations, at 1 (Mar. 2023), http://www.jfa-associates.com/__static/617ae4b450b858cfdc7df0ea7c910cd2/the-impact-of-covid-19-on-crime-arrests-and-jail-populations-expanding-analysis-to-21-months-post-pandemic-and-beyond-1.pdf?dl=1 [https://perma.cc/R39L-R3SG]; *see id.* at 22 ("Never had jail populations declined so much in such a short time frame, universally, across the country.").

So, to the extent Vargas suggests that the COVID-19 pandemic did not encumber the government's efforts to arrest him, we are unconvinced.  It is abundantly clear to us that during this timeframe, the world -- including the DEA -- was not operating normally on account of the pandemic, and this was, surely, an understandable drag on the government's inner workings.  The Supreme Court has told us that while "negligence or overcrowded courts" should be weighed against the government -- albeit "less heavily" than a "deliberate attempt to delay the trial in order to hamper the defense" -- "a valid reason, such as a missing witness, should serve to justify appropriate delay."  *Barker*, 407 U.S. at 531.  A global pandemic like COVID-19 "that is beyond the control of all the parties involved" similarly "justifies an appropriate delay."  *Crittenden*, 2020 WL 5223303, at *3.  And while we do not think that the onset of COVID-19 gave the government a complete pass to

abandon all of its obligations and duties, we are unable to hold its negligence -- especially when it was nothing more than that -- heavily against it. At the very least, then, we agree with the district court that COVID-19 was a "complicating factor" and that this period of time does not weigh "heavily" against the government.

Thus, putting to one side of the calculus the first ten months and the last seventeen months post-indictment, we are left with an eight-month period of no activity, beginning in August 2019 and ending in March 2020. It appears that during this time, Palat was transferred to work for the DEA in Mexico, and no one followed up on Vargas's arrest. But even where the government has dropped the ball for a period of time, we've recognized that a situation like this one -- involving an arresting officer who lives outside of the defendant's jurisdiction or who understands another agency to be responsible for the arrest -- makes the government's negligence somewhat less culpable. *See, e.g.*, *Oliva*, 909 F.3d at 1305–06; *Clark*, 83 F.3d at 1352–53; *United States v. Carter*, 603 F.2d 1204, 1207 (5th Cir. 1979).

In *Clark*, for example, our Court excused a seventeen-month delay between an indictment and the defendant's arrest even though few steps were taken to secure the arrest. 83 F.3d at 1352–53. In fact, during this period, the defendant had continuously resided in the same apartment listed on the arrest warrant, had attended classes at the same local university as he had prior to his alleged illegal activities, and had not attempted to elude the authorities, and the only attempt to locate the defendant prior to the date

of his arrest was made by a city police officer who testified that no one answered when he knocked on the door of Clark's apartment. *Id*. But even there, we decided that despite the arresting officer's "feeble" efforts -- attributable to the arrest warrant having mistakenly "fallen through the cracks" -- we would not weigh the delay heavily against the government when it was "unintentional" and resulted from the "erroneous assumption that [another agency,] the U.S. Marshal's office[,] had taken over the case." *Id*. at 1353.

Likewise, in *Oliva*, we held that a twenty-three-month delay between an indictment and the defendants' arrests did not weigh heavily against government. 909 F.3d at 1302–03, 1305–06. During that period, the arresting officer was a federally deputized state law enforcement officer who had made only "a minimal attempt to follow up on the Appellants' arrest" by conferring with another task force officer; he was unfamiliar with federal indictment and arrest procedure; like the investigator in *Clark*, he remained under the impression that he was not responsible for the arrests, although he did not follow up with the U.S. Marshals Service about the matter; and the prosecutor who secured the indictment left the U.S. Attorney's Office and was not replaced on the case for more than a year. *Id*. at 1305. Eventually, the arresting officer's supervisor told him of his mistake and he quickly made the arrests. *Id*.

While we found the government's negligence to be "worrisome," because there were many steps the officer could have taken to effectuate the arrests, we nevertheless found his "good-faith attempt to arrest the Appellants" to have been "diligent enough to

avoid warranting the extraordinary remedy of dismissing their indictments." *Id*. at 1305–06 (internal quotation marks omitted); *see also Carter*, 603 F.2d at 1206–07 (holding that a fourteen-month post-indictment delay -- where the defendant had left Florida before the indictment, had been living openly in Virginia the whole time, and had returned to Florida six times during the delay, and where the defendant did not timely assert his right to a speedy trial -- did not deprive the defendant of his right to a speedy trial).

These cases illustrate that even if little activity takes place for a year or two, the government will not necessarily be held responsible for the delay, as long as the government's conduct was unintentional and in good faith, even if negligent. As we've examined, the delays in this case resulted primarily from the difficulties the case agent, in Miami, had in effectuating Vargas's arrest in New York, where Vargas had deliberately returned after his initial arrest; the negligence of several law enforcement groups in New York in making the arrest; the failure of the DEA to follow up when the Miami case agent was transferred to Mexico; and the unusual and substantial obstacles created by the COVID-19 pandemic, which made everything, especially arrests, even more complicated. So while we cannot deny that for a significant portion of the thirty-five-month delay, Vargas's case seemed to "fall[] through the cracks," nor can we say that this negligence was so overwhelming as to make the government at fault for the entire delay. *See Clark*, 83 F.3d at 1353.

At no point during the thirty-five-month period did the government intentionally delay Vargas's arrest to further any prosecutorial strategy, to cause any harm to his defense or personal life, or for any other purposeful reason. The government preserved the evidence in the case from the time the undercover officer got involved throughout Vargas's arrest, recording the drug transaction and all communications underlying the offense of conviction, confiscating and testing the heroin, and obtaining Vargas's confession, which he made immediately upon his initial arrest in June 2018. Thus, once Vargas's cooperation ended in New York, the government was not waiting for a witness or more evidence or new inculpatory admissions or a joint trial to make its case against him.

Moreover, when Vargas was stopped in the fall of 2021 and re-arrested, he again did not contest his involvement, waiving his right to a jury trial and jointly filing, with the government, a factual proffer, which admitted that Vargas committed the offenses in the indictment. In no way do we see how the delay could have helped the government's case against Vargas.

It's also telling that Vargas was living freely during these thirty-five months. As we've put it, "[t]hough a purposeful attempt to delay the trial to prejudice the defendant or to gain a tactical advantage for itself should weigh heavily against the Government, a more neutral reason, such as negligence, does not necessarily tip the scale in favor of the defendant, *particularly where the defendant was at liberty and outside the jurisdiction where the indictment was returned*." *Bagga*, 782 F.2d at 1544 (emphasis added; citation omitted).

That is exactly what happened here -- during the delay between indictment and arrest, Vargas was living his life in New York without restriction, even traveling internationally to the Dominican Republic, and was not detained or on trial during the throes of the COVID-19 pandemic. While we do not know how long Vargas was out of the United States, or whether he may have left on other occasions, we know that he traveled to the Dominican Republic for some period of time, possibly making his arrest even more difficult.

All of this is to say that because the government was, at most, negligent for a portion of the delay, during which time Vargas was free to come and go without any impediment, we agree with the district court's conclusion that the delay taken as a whole should not be weighed "heavily" against the government. *Id.*[2]

---

[2] This case is different from two that Vargas relies on -- *Doggett* and *Ingram*. In *Doggett*, the delay was eight-and-a-half years; it was caused solely by government negligence; and, importantly, the government apparently did not enter the defendant's name into any international fugitive system, nor even the credit-check system the U.S. Marshals eventually used to locate him six years after his return to the U.S. 505 U.S. at 649–50, 657–58. As for *Ingram*, the delay there totaled four-and-a-half years -- comprised of a two-year post-indictment delay, which was preceded by a two-and-a-half-year pre-indictment delay that our Court found to be "inordinate" -- the agent was in the defendant's jurisdiction and knew he was the only law enforcement agent responsible for arresting Ingram, and he had more than enough information to do so. 446 F.3d at 1337–39. In contrast, while Special Agent Palat knew he was the case agent on Vargas's case, he lived in a different jurisdiction from Vargas, he was relying on officers in that jurisdiction whom he repeatedly nudged to arrest Vargas

B.

Having discussed, exhaustively, the length of and reasons for the delay, we turn to the third *Barker* factor -- whether Vargas timely asserted his constitutional right to a speedy trial. *See Clark*, 83 F.3d at 1353. As we've detailed, the record reflects that in July of 2021, Vargas was stopped by immigration authorities on his return from the Dominican Republic and was informed of the pending indictment; he was arrested at his home on August 18, 2021; and he was arraigned in September 2021. One month later, in October 2021, Vargas asserted his right to a speedy trial by filing a motion to dismiss in the district court. On this record, the district court found that Vargas had timely asserted his right to a speedy trial, but that his "timely assertion of his right to speedy trial d[id] not excuse the requirement to show prejudice under the fourth *Barker* factor."

We agree with the district court's assessment of this factor. *Cf. Ingram*, 446 F.3d at 1340 (weighing this factor heavily against the government where the defendant immediately sought to turn himself in when he was first made aware of the indictment); *Dennard*, 722 F.2d at 1513 (weighing a fifteen-month delay heavily against the government in one codefendant's case -- where the codefendant, immediately upon learning of the Florida indictment, attempted to surrender himself in the District of Colorado and contacted prosecutors in multiple locations -- and not in the case of

---

but who still acted negligently, and the length of the delay was less than three years total -- some of which was outside of the government's control.

another codefendant who had not learned of the indictment before her arrest and had not attempted to surrender).

### C.

At this stage of the *Barker* analysis, we must decide whether the first three factors "uniformly weigh heavily" against the government in Vargas's case. *Dunn*, 345 F.3d at 1296. As we've indicated, we do not believe that they do. The government's conduct was not so "ponderously," so "massively," so "oppressively" burdensome that we must penalize it for a thirty-five-month delay that was, at times, understandable and justified, and at other times nothing more than negligent.

We've accepted, in other cases, that it may be necessary to hold the government accountable for delays that are "flagrant and inexcusable," but we are not faced with this kind of conduct here. *Turner*, 515 F.2d at 858. It bears repeating that nothing in the record suggests that the government's delay in arresting Vargas was deliberate, intentional, or otherwise in bad faith. *See Barker*, 407 U.S. at 531 (bad-faith delay weighs heavily against the government); *United States v. Davenport*, 935 F.2d 1223, 1240 (11th Cir. 1991) (same). The record also does not paint a picture of years of blatant governmental negligence. *See Doggett*, 505 U.S. at 657 (involving a delay of eight years). As a result, we are unwilling to hold the government's thirty-five-month delay heavily against it, and we will not take the extraordinary step of excusing Vargas from showing actual prejudice. *See Ringstaff*, 885 F.2d at 1544–45 ("[C]ourts should not lightly dispense with the actual prejudice requirement

because to do so necessarily results in the 'severe remedy of dismissal of the indictment.'" (quoting *Barker*, 407 U.S. at 522)).

## D.

While we need not reach the question of prejudice since Vargas has conceded it, we think it's worth making a few points. *See Davenport*, 935 F.2d at 1240 (noting that the appellant had conceded "that he cannot show any prejudice due to the delay," but nevertheless conducting "our [own] review of the record," which disclosed "no evidence that appellant's presentation of his defense was impaired due to the delay").

For one thing, the Supreme Court has characterized as "the most serious" interest addressed by the right to a speedy trial its need "to limit the possibility that the defense will be impaired" because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532; *see also Ewell*, 383 U.S. at 120. A fair consideration of this concern illuminates why this case does not run afoul of the speedy-trial right protected by the Sixth Amendment, reminding us of one of the basic reasons for the test and the right we are tasked with protecting.

Our own review of the record confirms that Vargas's defense was not prejudiced as a result of the delay. Again, the closely monitored drug transaction and all communications surrounding the offense of conviction were recorded. Two kilograms of heroin were recovered and tested, and Vargas immediately confessed when he first was arrested in June 2018. Then, when Vargas was

stopped in the fall of 2021 and re-arrested, he waived his right to a jury trial and he and the government jointly filed a factual proffer, in which Vargas plainly admitted that he committed the offenses in the indictment.  Vargas has never claimed that the government sought any tactical advantage by delaying his arrest, other than its efforts, based on the promises he had made on his arrest, to obtain his cooperation for more information about the criminal enterprise of which he had been a part.  This cooperation never materialized, through no claimed fault of the government, and he was thereafter indicted.  All told, there is nothing to indicate that the delay in Vargas's arrest affected the evidence, the charges, the legal defenses or strategies, or any other aspect of Vargas's criminal proceedings.

Indeed, *none* of the concerns the speedy-trial right is meant to address was at play here.  During the thirty-five-month delay, Vargas was not incarcerated, and we have no reason to believe that he was enduring public scorn or accusation, that he had any difficulties in finding employment, or that his ability to exercise his First Amendment rights was impaired.  *See Barker*, 407 U.S. at 532; *Ewell*, 383 U.S. at 120.  Actually, if anything, Vargas personally *benefited* from the government's delay.  *See Hoskins*, 485 F.2d at 1188 n.3 (observing that the *Barker* prejudice factor encompasses both prejudice to the defense as well as to the defendant himself).  During this time period, Vargas was living freely at his home in New York, even able to travel internationally.  As a result of the government's delay, Vargas was neither arrested or detained during the early days of the COVID-19 pandemic, when "COVID-19 pose[d] novel health risks to incarcerated inmates," *Swain v. Junior*, 961 F.3d 1276, 1294 (11th

Cir. 2020), and impaired inmates' abilities to prepare for their own defenses, *see, e.g.*, *United States v. Ahmed*, 73 F.4th 1363, 1374 (11th Cir. 2023) (noting that a defendant's lawyer had refused to meet with an incarcerated client during COVID-19 out of a concern for his own health). We find it hard to take seriously Vargas's suggestion that he would have preferred to have been arrested, processed and detained during this unforgiving time period.

We'll stop there. We recognize that, sometimes, when the government's conduct has been most reprehensible, a showing of prejudice is not necessary. *See Turner*, 515 F.2d at 858. But this is not that case. Accordingly, we hold that Vargas's Sixth Amendment right to a speedy trial has not been violated, and we affirm the judgment of the district court.

**AFFIRMED.**

22-10604                 JORDAN, J., Concurring                1

JORDAN, Circuit Judge, Concurring in the Judgment.

The Sixth Amendment speedy trial factors, which comprise a "balancing test," are the length of the delay (also phrased as who is to blame for the delay), the reasons for the delay, the defendant's assertion of his right to a speedy trial, and the prejudice to the defendant. *See Doggett v. United States*, 505 U.S. 647, 651 (1992); *Barker v. Wingo*, 407 U.S. 514, 530 (1972). Like most Sixth Amendment speedy trial cases, this one turns on the second factor, which is "[t]he flag all [speedy trial] litigants seek to capture[.]" *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986).

★ ★ ★ ★ ★

It has been the law of this Circuit for over 50 years that, when there is a "point of coalescence of the [first] three factors in a [defendant's] favor," prejudice "becomes totally irrelevant." *Hoskins v. Wainwright*, 485 F.2d 1186, 1192 (5th Cir. 1973) (applying *Barker*). So when the first three factors "are heavily weighted in favor of the accused, [he] need demonstrate no prejudice at all." *United States v. Avalos*, 541 F.2d 1100, 1116 (5th Cir. 1976).

Significantly, "[t]he reason for dispensing with the prejudice requirement entirely when the other three factors point heavily toward a violation of [the] speedy trial [guarantee] is deterrence: the prosecution should not be permitted to engage in inexcusable misconduct on the hope that the defendant will not be able to make out a case of prejudice." *Turner v. Estelle*, 515 F.2d 853, 858 (5th Cir. 1975). As the Fifth Circuit has explained, the "first three factors should be used to determine whether the defendant bears the

burden to put forth specific evidence of prejudice (or whether it is presumed)," and it is improper to "perform[ ] the analysis the other way around, i.e., using the absence of specific evidence of prejudice to reduce the weight of the other three factors." *United States v. Bergfeld*, 280 F.3d 486, 490 (5th Cir. 2002) (emphasis omitted).

★ ★ ★ ★ ★

Whether "a defendant's constitutional right to a speedy trial has been violated is a mixed question of law and fact," with issues "of law . . . reviewed *de novo*" and findings of fact subject to "the clearly erroneous standard." *United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996). When a district court makes findings on the speedy trial factors but does not complete the "analysis by stating how heavily each factor weighs against the identified party," we "perform that analysis" ourselves on appeal. *See United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006).

The magistrate judge and the district court found that the 35-month delay was presumptively prejudicial and that Mr. Vargas made a timely assertion of his speedy trial rights, but both failed to make specific findings about how heavily each of those factors weighed against the government. In my view, both factors weighed heavily against the government. The heroin conspiracy and possession-with-intent-to-distribute charges against Mr. Vargas were not complex, and the almost-three-year delay was about two years longer than the one-year threshold needed to establish presumptive prejudice and trigger the speedy trial analysis. *See United States v. Schlei*, 122 F.3d 944, 987 (11th Cir. 1997) ("A delay is

22-10604                 JORDAN, J., Concurring                      3

considered presumptively prejudicial as it approaches one year."). *Cf. Ingram*, 446 F.3d at 1338-39 (concluding that a two-year post-indictment delay, when considered in light of a two-and-a-half-year pre-indictment delay, weighed heavily against the government). Mr. Vargas also timely asserted his speedy trial rights, doing so two months after his arrest and 28 days after his arraignment.  In *Ingram*, 446 F.3d at 1338, 1340, we concluded that this factor weighed heavily against the government where the defendant moved for dismissal of the charges 58 days after he surrendered in court.  As to the timely assertion of speedy trial rights, there is no meaningful difference between the facts in *Ingram* and those here.

* * * * *

That leaves the second factor, the reason for the delay.  The magistrate judge and the district court found that the government had been negligent and that the second factor did not weigh heavily against the government.  Critically, the Supreme Court has told us to "review trial court determinations of negligence with considerable deference."  *Doggett*, 505 U.S. at 652.  The findings here "must govern" if they are "'plausible' in light of the full record," even "if [others are] equally or more so[.]"  *Cooper v. Harris*, 581 U.S. 285, 293 (2017).

The clear error standard, properly applied, means that the findings here should not be disturbed on appeal.  But, as explained below, I think that the magistrate judge and the district court were way too charitable in describing the government's conduct.

Mr. Vargas lived at the same place in New York during the entire 35-month delay, and that was the address listed on his driver's license. There was no evidence that he was told he would be charged or knew of the indictment pending against him until he was stopped by immigration authorities in July of 2021. Nor was there any evidence that he was attempting to evade arrest.

The government, through Agent Palat, forwarded the arrest warrant to agents in New York and contacted other agents requesting assistance. The email correspondence amongst the agents began in October of 2018 and continued through June of 2019. Agent Palat also submitted a fugitive declaration form, resulting in the entry of the warrant into the NCIC system. And he initiated an Epic lookout for Mr. Vargas. As of January of 2019, nothing had been done to arrest Mr. Vargas. Supervisory Agent Romain therefore told Agent Palat to find out what was going on with Mr. Vargas' case, or call the prosecutor and have him dismiss the indictment.

Agents in New York told Agent Palat that they had attempted to locate Mr. Vargas on a *single* occasion and would be trying again. But there is no evidence whatsoever that any agents ever tried to find Mr. Vargas again during the rest of the 35-month period. Indeed, Agent Palat testified that he did not know how many times agents visited Mr. Vargas' residence between September of 2018—when the indictment was returned—and August 18, 2021—the date of Mr. Vargas' arrest.

Agent Palat transferred to another duty station in September of 2019. After that point in time the government made *no* efforts

22-10604                JORDAN, J., Concurring                5

to arrest Mr. Vargas until August of 2021—a period of almost two years.  This seems to me to go beyond mere negligence.

The magistrate judge and the district court thought that there were some mitigating circumstances in favor of the government.  First, Mr. Vargas was released from his initial custody so that he could try to cooperate.   Second, Agent Palat made "diligent" efforts to have Mr. Vargas arrested promptly and he relied on other agents to effect the arrest.  Third, the COVID-19 pandemic was a "complicating factor."

I recognize that I am not allowed to substitute my own findings for those of the magistrate judge and the district court, *see Cooper*, 581 U.S. at 292, and that is why I am concurring in the judgment.  But the government's dismal behavior in trying to arrest Mr. Vargas over a 35-month period warrants setting out my disagreement with the mitigating factors found by the magistrate judge and the district court.

That the government allowed Mr. Vargas to try to cooperate—a pre-indictment choice—means relatively little in a speedy trial analysis focusing on post-indictment delay.  The government's decision, moreover, was not an altruistic one, and anyone who knows anything about the DEA understands that cooperation is a two-way street in which the government expects to receive something of value for its undertaking.  In any event, once the government decided to proceed with an indictment Mr. Vargas' non-custody status became irrelevant, and it became the government's obligation to secure his arrest promptly.  "A defendant has no duty to bring himself to trial; the [government] has that duty." *Barker*, 407

U.S. at 527.  Though the government's "lethargy may have reflected no more than [Mr. Vargas'] relative unimportance in the world of drug trafficking, it was still . . . negligence[.]" *Doggett*, 505 U.S. at 653.

As for the purported diligence of Agent Palat, I do not view the evidence so kindly in favor of the government.  In the course of a year—from September of 2018 to September of 2019—Agent Palat sent less than a handful of emails to agents in New York, put the arrest warrant into the NCIC system, and initiated an EPIC lookout.  This does not constitute a "[c]onstant application to one's business duty" or a "persevering effort to accomplish something undertaken." Black's Law Dictionary 552 (10th ed. 2014) (defining diligence).  *Cf. Ingram*, 446 F.3d at  1139-40 (agent did not act diligently in trying to arrest defendant in the two years following his indictment because (a) he had "more than enough information" to carry out the arrest, (b) he knew where the defendant lived and worked, (c) the defendant did not change jobs or residence, (d) he visited the defendant's residence only once and did not go into the defendant's place of employment even though he drove by multiple times, (e) did not ask the defendant's brother (a policeman) about the defendant's whereabouts, and (f) did not refer the case to another law enforcement agency).

Assuming that Agent Palat somehow acted diligently, his conduct over a 12-month period is insufficient to be mitigating.  The delay here was 35 months, so there are 23 months in which Agent Palat was not involved and in which the government did nothing at all to arrest Mr. Vargas.  The conduct of a single agent,

for a limited period of time, should not and cannot justify the inaction of the government as a whole for the entire 35-month period.

Finally, even if the COVID-19 pandemic was a "complicating factor," the magistrate judge found that it "did not prevent" Mr. Vargas' arrest. The DEA had advised agents to work remotely when possible during the pandemic and to take steps to maintain social distancing, but those precautions relating to physical contact did not prevent agents from continuing to communicate electronically or by phone about pending matters like Mr. Vargas' arrest. And that policy also had nothing to do with the government's inaction before March of 2020.

The record contains nothing, absolutely nothing, about any communications between agents during the pandemic. That is not surprising, for it appears that when Agent Palat left for his new post in September of 2019—six months before the start of the pandemic—Mr. Vargas' case had fallen off the face of the DEA's earth. Had Mr. Vargas not been stopped fortuitously by immigration authorities in July of 2021, he would likely still be a free man today. What the Supreme Court said in *Doggett*, 505 U.S. at 657, bears repeating here: "[T]he weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial."

★ ★ ★ ★ ★

"The rationale for dispensing with the prejudice requirement entirely," when the other three factors of the speedy trial

standard weigh heavily against the government, "is that of deterrence." *United States v. Avalos*, 541 F.2d 1100, 1116 n.32 (5th Cir. 1976). If a set of facts called for a ruling which might have a deterrent effect on government apathy, it is this one. But the clear error standard, as applied to the findings made by the magistrate judge and the district court on the second speedy trial factor, prevents relief to Mr. Vargas.